UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 MAR -4 P 2: 19

U.S. DISTRICT COURT
DISTRICT OF MASS.

*********************************************

| | |
|---|---|
| CHARLES J. SENIOR, NORMAN FAHY, | * |
| RONALD D. PHIPPS, RAYMOND W. | * |
| POSTMA, THOMAS G. HIRL, | * |
| GARRETT M. FAGAN and UNITED | * |
| STEELWORKERS OF AMERICA, | * |
| LOCAL 12004, | * |
| | * |
| **Plaintiffs** | * |
| v. | * |
| | * |
| NSTAR ELECTRIC AND GAS | * |
| CORPORATION and COMMONWEALTH | * |
| GAS COMPANY, | * |
| | * |
| **Defendants.** | * |

Civil Action No. 04-10160-EFH

*********************************************

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO PROHIBIT USE OF
EXPERT WITNESS (CAROL CHANDOR), TO STRIKE EXPERT REPORT, AND IN
ALTERNATIVE FOR LEAVE TO CONDUCT DEPOSITION**

The Plaintiff retirees and their former labor union filed suit in January 2004, raising

claims over modifications to retiree health benefits, which claims were identical to those then

pending in Local 369, Utility Workers, et al v. NSTAR Electric and Gas Corp., Civil Action No. 03-

10530 (EFH). In May 2004, this Court entered summary judgment for NSTAR Electric and Gas

Corporation ("NSTAR") in Local 369, and dismissed the action. See Local 369, Utility Workers v.

NSTAR Electric and Gas Corp., 317 F. Supp. 2d 69 (D. Mass. 2004) (Exh. A hereto). Despite the

entry of summary judgment, the Plaintiffs to the present action have been allowed to engage in

discovery for over six (6) months. As part of discovery, Plaintiffs have produced an expert report

from Carol Chandor, the managing director and CEO of an employee benefits consulting firm. In

her report, Ms. Chandor expresses the opinion that certain retirees were guaranteed lifetime dental

insurance coverage, and that language in Company documents "does not eliminate this guarantee." (See Exh. B hereto at 6). Ms. Chandor's report and anticipated testimony simply repeat the Plaintiffs' legal position without setting forth matters upon which expert testimony is permitted. Accordingly, the motion to strike should be granted.

## A.    Case Background[1]

The individual Plaintiffs are former union employees of Commonwealth Gas Company ("Commonwealth Gas") who were represented by Plaintiff Local 12004 of the United Steelworkers of America upon retirement. After Boston Edison Company ("Boston Edison") and Commonwealth Energy System ("Commonwealth Energy") merged in 1999, which merger ultimately resulted in the creation of NSTAR Electric and Gas Corporation ("NSTAR"), NSTAR retained pre-existing retiree health plans maintained by those companies, until April 1, 2003. At that time, NSTAR instituted changes to health coverage, affecting all union and non-union retirees of both Boston Edison and Commonwealth Energy.

The Commonwealth Energy Post Retirement Benefit Program, established in 1993, has provided since that time that "the Company, through the Plan Administrator, may terminate the Program or discontinue Benefits hereunder at anytime..." In communications to employees and retirees regarding dental and other medical benefits, Commonwealth Energy consistently reserved its right to modify benefits. Employee benefit handbooks provided that "[t]he Company reserves the right, subject to the provisions of any collective bargaining agreement, to amend, modify or

---

[1]The facts set forth herein are drawn from the "Statement of Undisputed, Material Facts Submitted by NSTAR Electric and Gas Corporation and Commonwealth Gas Company Pursuant to Local Rule 56.1," to be filed in support of Defendants' Motion for Summary Judgment in this case on March 4, 2005.

terminate the Plan at anytime."  Summary plan descriptions, distributed regularly to employees and retirees, likewise contained similar language.

The changes to retiree health benefits instituted in April 2003 were intended to continue comprehensive retiree health benefits, while reducing expenses and the burden of maintaining different plans.  Some changes enhanced health benefits for Commonwealth Energy retirees, while others aligned benefits with those afforded Boston Edison retirees.

In Local 369, Utility Workers v. NSTAR Electric and Gas Corp., 317 F.Supp. 2d 69 (D. Mass. 2004), this Court entered summary judgment for NSTAR on claims by retirees of Commonwealth Electric Company, Commonwealth Gas and NSTAR who had been members of Local 369 of the Utility Workers Union.  Their claims challenged the same changes to retiree health benefits at issue in this action, including adjustments to retiree dental coverage under special retirement programs instituted in 1997 and 1999.  Their claims were based on the theory, also raised in this action, "that they were entitled to a life time of unaltered coverage under the Commonwealth plan." 317 F.Supp. 2d at 72.

This Court further considered benefit summary documents identical to those provided to some of the Plaintiff retirees in this action.  These documents provided, inter alia, that "your dental coverage will be for your life."  See Local 369, 317 F.Supp.2d at 74.  This Court found any argument based on this provision unpersuasive: "[T]he [benefit] summaries provide that '[i]f any conflict arises between this description and the Plan document, or if we do not cover any point, the terms of the Plan document will always govern.'  It is clear that the plan documents, not the plan summaries, control... [T]he plan documents clearly allow for the plans to be changed or cancelled." 317 F.Supp. 2d at 74-75.  In this regard, this Court held that "[t]he Master Medical, Medex and

3

dental benefit plans...explicitly state that the plans can be changed or cancelled." 317 F. Supp. 2d at 74. In an accompanying footnote (317 F.Supp. 2d at 74 n.3), this Court cited to "[t]he Master Medical plan [which] stated that '[w]e may change a part of the contract,' and that '[y]our plan sponsor may cancel your contract for any reason.' Similarly, the Medex plan stated 'Blue Cross and Blue Shield will cancel your membership under this certificate only when...[y]our group terminates the contract.' The Delta Dental Plan of Massachusetts also provided that '[y]our plan' sponsor may cancel your contract for any reason.'"

Based on the foregoing, this Court concluded, "the welfare benefit plans at issue here did not provided for a lifetime of unaltered health insurance coverage. The plaintiffs' claim for breach of plan provision in violation of ERISA is dismissed." 317 F.Supp. 2d at 77. See also 317 F.Supp. 2d at 77 n.7 (even if promise of unalterable health benefits made under 1997 retirement program, that program also "stated [that ] [t]his summary is not intended to offer detailed descriptions of the System's employee benefit plans. All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plan. If any conflict arises between this summary and the System's employee benefit plan documents, or if any point is not covered, the terms of the appropriate plan documents will govern in all cases.' As already explained in detail, the terms of the...dental benefits plan explicitly provided that the plans could be changed or cancelled.").

B.    **Carol Chandor**

1.    **Ms. Chandor's Knowledge, Skill, Experience, Training And Education**

Ms. Chandor holds a bachelor of arts degree from the University of Northern Colorado. She holds no other degrees. (See Curriculum Vitae, Exh. C hereto). Ms. Chandor spent

4

several years in the insurance industry before, in 1985, taking senior positions in employee benefit consulting firms which advise employers on matters such as reviewing and approving summary plan descriptions and other plan documents for employee welfare benefit plans. (See Exh. C hereto).

Ms. Chandor has testified as an expert at a labor arbitration, before the Massachusetts Labor Relations Commission (twice), and before the Commonwealth's Board of Conciliation and Arbitration. (See Exh. C hereto). However, she lists no expert testimony, either at deposition or at trial, in any judicial proceeding within the last four (4) years. (Compare Exh. C with Fed. R. Civ. P. 26(a)(2)(B)). In addition Ms. Chandor has not authored any publications of any sort within the last ten (10) years. (Compare Exh. C with Fed. R. Civ. P. 26(a)(2)(B)).

### 2.    Ms. Chandor's Opinions

Ms. Chandor's report expresses the opinion that certain plan documents utilized by Commonwealth Gas "are typical of those used by health and dental insurance providers in Massachusetts." (Exh. B at 3).[2] She adds: "In preparing and issuing summary plan descriptions Massachusetts health and dental insurers typically include a provision allowing the plan sponsor (the employer who provides and purchases the insurance coverage or its employees and retirees) to terminate the coverage at any time." (Exh. B at 4).

In addition, her report refers to a standard document ("Information Relative to Employee Benefits Upon Your Retirement Date") provided to retirees under retirement programs in 1997 and 1999, and concludes: "There is no conflict between the promise [therein] that 'Your

---

[2]Ms. Chandor's report never addresses language in Commonwealth Energy's summary plan descriptions, reserving the Company's right to modify or eliminate benefits. (See Statement of Undisputed Material Facts Submitted by NSTAR Electric and Gas Corporation and Commonwealth Gas Company pursuant to Local Rule 56.1, par. 7).

5

dental coverage will be for your life,' in documents given to plan participants and the standard provision stated in the Summary Plan Description(s) that allows the plan sponsor to 'cancel the plan' at any time." (Exh. B at 5).  In conclusion, Ms. Chandor writes: "It is clear that lifetime dental coverage is promised to the participant, and that the employer is guaranteeing this coverage.  The standard termination clause in the Summary Plan Description and/or insurance contract does not eliminate this guarantee."  (Exh. B at 6).

C.    **Argument:**    **MS. CHANDOR CANNOT TESTIFY AS AN EXPERT IN REGARD TO THE MATTERS SET FORTH IN HER REPORT**.

Rule 702 of the Federal Rules of Evidence provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  The three requirements embodied in the rule -- qualifications; testimony on specialized knowledge; and assistance of the trier in fact -- must be satisfied in order for expert testimony to be admitted into evidence.  U.S. v. Shay, 57 F.3d 126, 132 (1st Cir. 1995).

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the District Court plays the role of "gatekeeper," ensuring that fact-finding is not distorted by inappropriate testimony. Correa v. Cruisers, A Division of KCS International, Inc., 298 F.3d 13, 25 (1st Cir. 2002). This "gatekeeping" function extends both to scientific and to other technical and specialized expert testimony. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

Legal conclusions are wholly inappropriate as subjects for expert testimony.  "It is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law,

6

but for the judge." Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997) [quoting U.S. v. Newman, 49 F.3d 1, 7 (1st Cir. 1995) (quoting Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 512 (2nd Cir.), cert. denied, 434 U.S. 861 (1977)]. At least seven circuit courts have held that the Federal Rules of Evidence prohibit such testimony, and we now join them as to the general rule. 'Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect....' This is because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial." Nieves-Villanueva v. Soto-Rivera, 133 F.3d at 100 (quoting Burkhart v. Washington Metropolitan Area Transit Authority, 112 F.3d 1207, 1212 (D.C. Cir. 1997)).

In one of the cases cited approvingly in Nieves-Villanueva -- Marx Co v. Diners' Club, Inc., 550 F.2d 505, 509 (2nd Cir. 1977) -- the court found that a district court erred in admitting "expert" testimony consisting of "legal opinions as to the meaning of the contract terms at issue." The court in Marx & Co. held that "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." Marx & Co., 550 F.2d at 509-510. "'The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.'" Marx & Co., 550 F.2d at 510 (quoting Loeb v. Hammond, 407 F.2d 779, 781 (7th Cir. 1969)).

Applying these principles to this matter, it is apparent that Ms. Chandor's report must be stricken, and any expert testimony from her barred.

## 1.    Ms. Chandor's Opinions Do Not Concern Scientific, Technical Or Other Specialized Knowledge Which Will Assist The Finder Of Fact.

Expert testimony should only be admitted when it pertains to scientific, technical or other specialized knowledge. FRE 702. As shown by her report, Ms. Chandor claims expertise in

evaluating whether Commonwealth Gas guaranteed lifetime dental coverage to retirees under the two special programs, and whether specific documents gave the Company any right to modify dental benefits. Such alleged expertise is not the sort of "specialized knowledge" admissible under Rule 702. "In determining whether experts should be used, [a court considers] whether an untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Smith v. Colorado Interstate Gas Co., 794 F.Supp. 1035, 1044 (D. Colo. 1992).

By testifying to her opinion that Commonwealth Gas cannot modify dental benefits (at least based on the data referred in her report), Ms. Chandor will usurp the role of this Court. "Mere qualification as an expert is not a license to invade the jury's function by telling the jury what result to reach; nor is it appropriate for an expert to supplant the judge's function to instruct the jury on the law." Fund of Funds, Ltd. v. Arthur Andersen & Co., 545 F.Supp. 1314, 1372 (S.D.N.Y. 1983) (citations omitted). "Testimony which articulates and applies the relevant law circumvents the fact-finder's decision making process by dictating how to decide the case or what result to reach." Smith v. Colorado Interstate Gas Co., 794 F. Supp. at 1044.

Here, Ms. Chandor seeks to usurp the role of this Court by (1) interpreting the document with the "lifetime" language; (2) interpreting some (but not all) plan documents; and (3) concluding therefrom whether Commonwealth Gas made "guarantees" to prospective retirees. If advanced by Plaintiffs' counsel, such arguments would come as no surprise, and would be addressed in the usual and regular manner. When put in the mouth of a reputed expert, however, these arguments become an improper attempt to direct a ruling for Plaintiffs on an issue which courts and factfinders regularly address -- the interpretation of documents, and their legal effect. See Loeb

v. Hammond, 407 F.2d at 781 ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.").

Indeed, Ms. Chandor's report seeks directly to intrude upon a ruling on summary judgment by this Court in Local 369. As discussed above, this Court held that "[t]he Master Medical, Medex and dental benefit plans...explicitly state that the plans can be changed or cancelled." 317 F.Supp. 2d at 74. Ms. Chandor's report now seeks to explain, as a matter of "expert" opinion", that the very same provisions relied upon by this Court in granting summary judgment have no significance. Ms. Chandor's attempt to usurp the role of this Court should be rejected.

**2.    Ms. Chandor Is Not Qualified By Knowledge, Skill, Training Or Education To Render An Opinion On Whether Commonwealth Gas Made Any "Guarantees."**

Assuming arguendo that Ms. Chandor will testify to specialized knowledge which will assist the trier of fact in determining a relevant issue, the inquiry does not end there. Rather, Plaintiffs must establish that Ms. Chandor's "opinions are based upon specialized skill, training, or experience." U.S. v. Shay, 57 F.3d at 13. "A valid connection [must] exist between the expert's testimony and a disputed issue." Id. at n.5.

Ms. Chandor's qualifications do not meet this standard. Nothing in her report or curriculum vitae (Exhs. B and C hereto) demonstrates that she has any experience in determining the legal effect of documents. Ms. Chandor is not a lawyer, and indeed holds no master or doctorate degrees. That she has experience in reviewing summary plan descriptions, among other documents for employee benefit plans, does not equip her to describe for a fact-finder when Commonwealth Gas made "guarantees" about retiree benefits. "Unless the witness's opinions are informed by expertise,

9

they are no more than the opinions of a lay witness." <u>U.S. v. Shay</u>, 57 F.3d at 133.

Excluding Ms. Chandor's opinions, when she lacks the specialized knowledge and experience that others possess, is consistent with case law excluding experts who have general knowledge of an area, but lack the specific knowledge at issue in a particular action. <u>See Harper v. Godfrey, Inc.</u>, 63 Fair Empl. Prac. Cas. (BNA) 1223, 1236 (E.D. Wis. 1993), <u>aff'd in part, rev'd in part on other grounds</u>, 66 F.3d 1258 (7th Cir. 1995) (expertise in mathematics does not allow a person to render expert opinions on presence of discriminatory motive); <u>Havenfield Corp. v. H&r Block, Inc.</u>, 509 F.2d 1263, 1273 (8th Cir.), <u>cert. denied</u>, U.S. (1975) (no abuse of discretion in excluding witness with "limited experience" on matter about which he was to testify; "It is important that expert witnesses have experience in transactions that are as similar as possible to the transaction upon which they are being asked to comment.").

**D.**     <u>**Conclusion**</u>

For all the above reasons, Ms. Chandor's report should be stricken, and her testimony at trial or at any other stage of this proceeding barred. In the alternative, if the instant motion is denied, Defendants should be granted leave to depose Ms. Chandor.

Respectfully submitted,

NSTAR ELECTRIC AND GAS CORPORATION and COMMONWEALTH GAS COMPANY,

By their Attorneys,

MORGAN, BROWN & JOY, LLP
200 State Street, 11th Floor
Boston, MA 02109-2605
(617) 523-6666

By:_____
      Keith B. Muntyan
      B.B.O. #361380
      Robert P. Morris
      B.B.O. #546052

Dated: March 4, 2005

## CERTIFICATE OF SERVICE

I, Robert P. Morris, certify that on March 4, 2005, I caused to be served a copy of the within pleading by hand on counsel for Plaintiffs, Warren H. Pyle, Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108.

_____
Robert P. Morris

11

Westlaw.

317 F.Supp.2d 69
317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774
(Cite as: 317 F.Supp.2d 69)

Page 1

C

**Motions, Pleadings and Filings**

United States District Court,
D. Massachusetts.
UTILITY WORKERS, LOCAL 369, Robert J.
Dupre, et al., Plaintiffs
v.
NSTAR ELECTRIC AND GAS CORPORATION,
Defendant.
No. CIV.A.03-10530-EFH.

May 12, 2004.

**Background:** Local union and retired utility workers
sued electric and gas corporation formed as result of
merger between their employer and another
company, alleging it violated federal and state laws
when it switched them to the same health insurance
plans as retirees of the other company. Defendant
corporation moved for summary judgment.

 **Holdings:** The District Court, Harrington, Senior
District Judge, held that:
 (1) ERISA preempted state law breach of contract
and misrepresentation claims;
 (2) promissory estoppel could be asserted as part of
Labor Management Relations Act (LMRA) breach of
contract claim, but could not be brought as
independent LMRA cause of action;
 (3) separate cause of action for promissory estoppel
was not "appropriate equitable relief" under ERISA;
 (4) for purposes of LMRA breach of contract claim,
"will be covered" language in collective bargaining
agreements (CBAs) was not ambiguous, and
agreements did not prohibit type of changes at issue;
and
 (5) plans at issue were welfare benefit plans not
subject to ERISA's stringent vesting, participating
and funding requirements for pension plans, and they
did not provide for lifetime of unaltered health
insurance benefits.
 Motion granted.

West Headnotes

**[1] Labor and Employment** ⚖️77
231Hk77

**[1] States** ⚖️18.51
360k18.51
ERISA preempted state law claims by local union
and retired utility workers for breach of contract and
misrepresentation; claims both related to postmerger
corporation's alleged representation that workers'
benefit plans, including health insurance for retirees,
would not change and necessarily had connection
with or reference to benefit plan itself. Employee
Retirement Income Security Act of 1974, § 514(a),
29 U.S.C.A. § 1144(a).

**[2] Estoppel** ⚖️85
156k85
Federal common law of contract applicable under
LMRA includes doctrine of promissory estoppel;
thus, while promissory estoppel may be asserted as
part of LMRA breach of contract claim, it cannot be
brought as independent cause of action. Labor
Management Relations Act, 1947, § 301, 29
U.S.C.A. § 185.

**[3] Estoppel** ⚖️85
156k85

**[3] Labor and Employment** ⚖️660
231Hk660
ERISA promissory estoppel claim arises under
federal common law and is considered form of
"appropriate equitable relief." Employee Retirement
Income Security Act of 1974, § 502(a)(3), 29
U.S.C.A. § 1132(a)(3).

**[4] Estoppel** ⚖️85
156k85

**[4] Labor and Employment** ⚖️660
231Hk660
Separate cause of action for promissory estoppel was
not "appropriate equitable relief" under ERISA,
where retirees had adequate, alternative form of relief
in form of action to recover benefits due under terms
of plan and had pursued that alternative cause of
action in their amended complaint. Employee
Retirement Income Security Act of 1974, §
502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B),(3).

**[5] Labor and Employment** ⚖️1235
231Hk1235
Collective bargaining agreements are contracts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

317 F.Supp.2d 69
317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774
(Cite as: 317 F.Supp.2d 69)

Page 2

governed by federal common law.

**[6] Contracts** 🔑176(1)
95k176(1)

**[6] Contracts** 🔑176(2)
95k176(2)
Generally speaking, contract interpretation is legal question for the court, unless contract is ambiguous, in which case interpretation may become fact question for jury.

**[7] Contracts** 🔑176(2)
95k176(2)
Whether contract is ambiguous in the first instance is matter of law for court.

**[8] Contracts** 🔑143(2)
95k143(2)
Contract is "ambiguous" if agreement's terms are inconsistent on their face or where phraseology can support reasonable differences of opinion as to meaning of words employed and obligations undertaken.

**[9] Contracts** 🔑143.5
95k143.5
When interpreting contract, court cannot view words or phrases in isolation; instead, language of contract must be given construction which comports with agreement as whole.

**[10] Labor and Employment** 🔑445
231Hk445
Language in collective bargaining agreements (CBAs) that eligible employees "will be covered" under terms and conditions of health insurance plans was not ambiguous, and CBAs did not prohibit postmerger corporation from making contested changes in benefit coverage for retirees; CBAs explicitly incorporated provisions of plans which in turn explicitly stated they could be changed or cancelled, and did not incorporate benefit summaries stating that coverage would be "for life," which would not control over plan documents anyway. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**[11] Estoppel** 🔑52(5)
156k52(5)
In order for estoppel to apply, preliminary showing of ambiguity is required; estoppel may not be invoked to enlarge or extend coverage specified in contract.

**[12] Labor and Employment** 🔑425
231Hk425

**[12] Labor and Employment** 🔑549(1)
231Hk549(1)
Under ERISA, welfare benefit plans are not subject to stringent vesting, participation and funding requirements imposed on pension benefit plans; in fact, employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. Employee Retirement Income Security Act of 1974, § 3(1, 2), 29 U.S.C.A. § 1002(1, 2).

**[13] Labor and Employment** 🔑549(1)
231Hk549(1)
Defining eligibility requirements for participation in retiree welfare benefits plan is not the same as granting vested rights; "vested" welfare benefits are forever unalterable, whereas eligibility requirements merely establish when or if person may participate in welfare benefits plan should employer decide to offer one. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[14] Labor and Employment** 🔑630
231Hk630
Court must enforce ERISA plans according to their literal and natural meaning. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

*71 Paul F. Kelly, Segal, Roitman & Coleman, Boston, MA, for Local 369 Utility Workers, Milton Jenkins, Ruth Rebello, Mary Vieira, Mary Souza, Antone Bernardo, Emile Cipriani, Jeanne Carrier, Robert Tavares, Henry Knutsen, Vincent Crowley, Elizabeth Mitchell, Cynthia Prsybyszewski, John Whalen, Andrew Woodacre, Arnett Peccini, Plaintiffs.

Keith B. Muntyan, Morgan, Brown & Joy, Robert P. Morris, Morgan, Brown & Joy, Boston, MA, for Nstar Electric & Gas Corporation, Roxanne Beth Bungert, Defendant.

### MEMORANDUM AND ORDER

HARRINGTON, Senior District Judge.

The plaintiffs allege that the defendant violated federal and state laws when it changed certain retirement benefits to which the plaintiffs were entitled. The plaintiffs include Utility Workers Local 369 ("the Union") and twenty-five individuals who

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

317 F.Supp.2d 69
317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774
(Cite as: 317 F.Supp.2d 69)

retired from working for Commonwealth Energy ("Commonwealth"), which was merged with another corporation to form the defendant, NSTAR Electric and Gas Corp. ("NSTAR"). NSTAR has moved for summary judgment on all claims. NSTAR's motion is granted.

## I. BACKGROUND

NSTAR was created in 1999 by the merger of two companies, Boston Edison Co. ("Boston Edison") and Commonwealth. Prior to the merger, Boston Edison and Commonwealth maintained their own health insurance plans for retirees. After the merger, NSTAR retained these two separate plans until April 1, 2003, when it decided that Commonwealth retirees should be covered under the same plan as the Boston Edison retirees. The plaintiffs allege that they were entitled to a lifetime of unaltered coverage under the Commonwealth plan. According to the plaintiffs, switching to the Boston Edison plan caused them to pay more money for their health care or caused them to lose certain benefits that were covered by their previous plan. NSTAR maintains that the new plan is actually more generous than the Commonwealth retirees' previous plan.

The plaintiffs' amended complaint contains six counts. These include a claim for breach of collective bargaining agreements in violation of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; a claim for breach of employee benefit plan provisions in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132; a claim of promissory estoppel under the LMRA; a claim of promissory estoppel under ERISA; a state law claim for breach of contract; and a state law claim *72 for misrepresentation. The complaint sought a permanent injunction against NSTAR, class certification, a clarification of the plaintiffs' rights, damages, and attorney's fees. After the complaint was filed, the plaintiffs moved for a preliminary injunction and class certification, but both motions were denied. NSTAR then filed the pending motion for summary judgment on all claims.

## II. DISCUSSION

A motion for summary judgment should be granted in favor of the defendant when the evidence, taken in the light most favorable to the plaintiff, shows that there is no genuine issue of material fact and that the defendant is entitled to judgment as a matter of law. See Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir.2003). The heart of this case is the plaintiffs' claims for breach of collective bargaining agreements in violation of the LMRA, and breach of employee benefit plan provisions in violation of ERISA. Before delving into those matters, the Court quickly addresses the plaintiffs' state law and estoppel claims.

[1] The First Circuit has held that ERISA "broadly preempts any state law claim that 'relate[s] to' an employee benefit plan...." Hotz v. Blue Cross and Blue Shield of Mass., Inc., 292 F.3d 57, 60 (1st Cir.2002). In this case, the plaintiffs' state law breach of contract and misrepresentation claims both relate to NSTAR's alleged representation that the plaintiffs' benefit plans would not change. These claims necessarily have "a connection with or reference to" the benefit plan itself. Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 794 (1st Cir.1995). Thus, the plaintiffs' state law claims for breach of contract and misrepresentation are preempted by federal law and are dismissed. See Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 277 (1st Cir.2000) (affirming district court's ruling that plaintiff's state law breach of contract claim was preempted by ERISA); Carlo, 49 F.3d at 794 (plaintiff's state law misrepresentation claim preempted by ERISA).

[2] Preemption, however, does not apply to the plaintiffs' promissory estoppel claims because they are brought under the LMRA and ERISA, not under state law. The Court examines the LMRA promissory estoppel claim first. The defendant points to Sixth Circuit precedent holding that "[t]he federal common law of contract applicable under the LMRA includes the doctrine of promissory estoppel." Anderson v. AT&T Corp., 147 F.3d 467, 477 (6th Cir.1998). This means that while promissory estoppel may be asserted as part of an LMRA breach of contract claim, it "cannot be brought as an independent cause of action...." Bish v. Aquarion Servs. Co., 289 F.Supp.2d 134, 148 n. 9 (D.Conn.2003); see also Duran v. AT & T Corp., 2000 WL 33592869, *8 (S.D.Ohio 2000). In their papers opposing summary judgment, the plaintiffs make no developed counter argument on this issue and offer no authority to the contrary. Accordingly, the Court finds the Sixth Circuit precedent to be persuasive. The plaintiffs' separate claim of promissory estoppel under the LMRA is dismissed.

[3][4] The plaintiffs' ERISA promissory estoppel claim is also unavailing. An ERISA estoppel claim arises under the federal common law and is considered a form of "appropriate equitable relief" that is available under Section 1132(a)(3) of ERISA.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

317 F.Supp.2d 69
317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774
(Cite as: 317 F.Supp.2d 69)

Page 4

*See Reid v. Gruntal & Co., Inc., 763 F.Supp. 672, 678 (D.Me.1991); see also Ctr. v. First Int'l Life Ins. Co., 1997 WL 136473, *13 (D.Mass.1997).* However, equitable relief under Section 1132(a)(3) is not appropriate when "Congress elsewhere provided adequate relief for a beneficiary's injury." *73 *Varity Corp. v. Howe, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); see also Larocca v. Borden, Inc., 276 F.3d 22, 28-29 (1st Cir.2002).* In this case, Congress provided the plaintiffs with an adequate, alternative form of relief in the form of Section 1132(a)(1)(B), which provides plaintiffs with a cause of action "to recover benefits due ... under the terms of [the] Plan." Indeed, the plaintiffs have pursued this alternative cause of action in their amended complaint. [FN1] In light of this alternative claim, the plaintiffs' separate cause of action for promissory estoppel under ERISA is not "appropriate equitable relief," and is dismissed. *See King v. UNUM Life Ins. Co. of Am., 221 F.Supp.2d 1, 4-5 (D.Me.2002).*

> FN1. Count II of the complaint contains a claim for "breach of plan provision under ERISA," in which the plaintiffs allege that NSTAR has denied the plaintiffs "benefits due them under the terms of the plans." Although Count II makes no reference to any particular subsection of ERISA, the plaintiffs' memorandum in opposition to NSTAR's motion for summary judgment concedes that Count II is governed by Section 1132(a)(1)(B).

Having dismissed the plaintiffs' two state law claims and two promissory estoppel claims, the Court now addresses the primary issues in this case, namely the plaintiffs' claims for breach of collective bargaining agreements in violation of the LMRA, and breach of employee benefit plan provisions in violation of ERISA.

The Court begins with the LMRA claim. The plaintiffs argue that summary judgment is not appropriate on this claim because the collective bargaining agreements are ambiguous. [FN2] This ambiguity, according to the plaintiffs, means that interpreting the agreements is a question of fact best left for the jury.

> FN2. The plaintiffs are covered by multiple collective bargaining agreements. The parties agree, however, that the relevant portions of all the collective bargaining agreements are substantially the same.

[5][6][7][8] Collective bargaining agreements are contracts governed by federal common law. *See Textile Workers v. Lincoln Mills of Ala., 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).* Generally speaking, contract interpretation is a legal question for the court, unless the contract is ambiguous, in which case the interpretation may become a fact question for the jury. *See Casey v. Lifespan Corp., 62 F.Supp.2d 471, 480 (D.R.I.1999).* Whether a contract is ambiguous in the first instance is a matter of law for the court. *See Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 53 (1st Cir.2001).* A contract is ambiguous if "an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Id.* (quoting *Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1084 (1st Cir.1989)).* The plaintiffs argue that ambiguity stems from language in the collective bargaining agreements that states:

> [E]ligible employees ... will be covered ... under the terms and conditions of Blue Cross and Blue Shield of Massachusetts Master Medical Certificate, MM CES 3, as amended, or Medex Subscriber Certificate, Medex CES 1, as amended, the provisions of which are made a part of this Contract.

Similar language was used regarding the dental benefits plan offered by the defendant. The plaintiffs contend that the phrase "eligible employees" could be construed to include retirees and that "will be covered" could mean a lifetime of unaltered coverage under the specified plans. NSTAR argues that the phrase "eligible employees" refers only to people currently working, not retirees. NSTAR further argues that the contract provides no indication that coverage would extend beyond *74 the expiration date of each collective bargaining agreement.

[9][10] The place to start is with the phrase "will be covered." When interpreting a contract, this Court cannot view words or phrases in isolation. *See Cochran v. Quest Software, Inc., 328 F.3d 1, 7 (1st Cir.2003).* Instead, the language of a contract must be given "a construction which comports with the Agreement as a whole." *See Fashion House, 892 F.2d at 1084.* In this case, the collective bargaining agreements do not define the phrase "will be covered." The collective bargaining agreements do, however, explicitly incorporate the provisions of the Master Medical, Medex and dental benefit plans. The Master Medical, Medex and dental benefit plans, in turn, explicitly state that the plans can be changed or cancelled. [FN3] In light of these facts, the terms

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the collective bargaining agreements are not inconsistent, nor can there be reasonable differences of opinion regarding the meaning of the phrase "will be covered." *See In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 58 F.3d 896, 903-04 (3d Cir.1995)* ("the fact that the ... plans used terms such as 'lifetime' or 'for life' to describe the duration of retiree medical benefits, while at the same time expressly reserving the company's right to terminate the plans under which those benefits were provided, did not render the plans 'internally inconsistent' and therefore ambiguous."). When the benefit plans and the collective bargaining agreement are read as a whole contract, it is clear that the phrase "will be covered" cannot mean a lifetime of unaltered coverage, as the plaintiffs contend, because the health benefit plans contain language in which the insurance company and NSTAR reserve the right to change or cancel coverage. *See DeGeare v. Alpha Portland Indus., Inc., 837 F.2d 812, 816 (8th Cir.1988)* (holding employer's promise that retiree benefits "will continue" did not create vested lifetime benefits in the face of a termination clause), vacated and remanded on other grounds, *489 U.S. 1049, 109 S.Ct. 1305, 103 L.Ed.2d 575 (1989)*. In short, the contract is not ambiguous and its interpretation is therefore a question of law for the court. *See Lohnes, 272 F.3d at 53.* The Court holds that by incorporating the terms of the Master Medical, Medex and dental benefit plans, the collective bargaining agreements at issue in this case did not prohibit NSTAR from making the types of changes at issue here. The plaintiffs' claim for breach of a collective bargaining agreement in violation of the LMRA is dismissed.

> FN3. The Master Medical plan, for example, stated that "[w]e may change a part of the contract," and that "[y]our plan sponsor may cancel your contract for any reason." Similarly, the Medex plan stated "Blue Cross and Blue Shield will cancel your membership under this certificate only when ... [y]our group terminates the contract." The Delta Dental Plan of Massachusetts also provided that "[y]our plan sponsor may cancel your contract for any reason."

The plaintiffs raise one counter argument that is particularly worthy of discussion. The plaintiffs contend that the collective bargaining agreements provided a lifetime of unaltered coverage because some plaintiffs received benefit summaries that stated "your medical insurance coverage will be for your life" and "your dental coverage will be for your life." The benefit summaries, however, were not incorporated into the terms of the collective bargaining agreements, as were the provisions of the Master Medical, Medex and dental benefit plans themselves. Therefore, the benefit summaries are not relevant to interpreting the terms of the collective bargaining agreements. Even if they were relevant, the benefit summaries explicitly state that "the Company reserves the *75 right, subject to the provisions of any collective bargaining agreement, to amend, modify or terminate the Plan at anytime." More importantly, the summaries provide that "[i]f any conflict arises between this description and the Plan document, or if we do not cover any point, the terms of the Plan document will always govern." It is clear that the plan documents, not the plan summaries, control. As has already been explained, the plan documents clearly allow for the plans to be changed or cancelled. *See Gable v. Sweetheart Cup Co., Inc., 35 F.3d 851, 856 (4th Cir.1994)* ("[E]xpress reservation of the company's right to modify or terminate the participants' benefits is plainly inconsistent with any alleged intent to vest those benefits."); *Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1519 (8th Cir.1988)* (holding that employer's promise to provide welfare benefits "until death of retiree" did not create vested rights because employer had expressly reserved the right to terminate or amend the plan).

[11] In light of this Court's holding regarding the phrase "will be covered," it is not necessary to explore the meaning of "eligible employees." Even if the collective bargaining agreements applied to retirees, the plaintiffs would still not have a viable claim because, as this Court has already held, the collective bargaining agreements did not provide for unaltered, lifetime coverage. Before leaving the plaintiffs' LMRA claim, a brief word must be said about promissory estoppel. As the Court mentioned previously when discussing the plaintiffs' LMRA estoppel claim, "[t]he federal common law of contract applicable under the LMRA includes the doctrine of promissory estoppel." *Anderson, 147 F.3d at 477.* The Court, however, need not consider the estoppel issue as part of the plaintiffs' claim for breach of collective bargaining agreements given that the agreements themselves are unambiguous. The First Circuit has explained that in order for estoppel to apply "a preliminary showing of ambiguity is required; estoppel may not be invoked to enlarge or extend the coverage specified in a contract." *Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 502 n. 10 (1st Cir.1993)* (citation and quotation marks omitted).

[12] The Court now turns to the second major issue

317 F.Supp.2d 69
317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774
(Cite as: 317 F.Supp.2d 69)

in this case, namely, the plaintiffs' allegation in Count II of the amended complaint that the defendant breached benefit plan provisions in violation of ERISA. It must be noted at the outset that Count II of the amended complaint does not allege that NSTAR violated the Master Medical, Medex or dental benefit plans themselves. Rather, the amended complaint alleges that NSTAR violated the Commonwealth Pension Plan and a second document entitled "Personnel Reduction Program" ("PRP"). Both the Commonwealth Pension Plan and PRP are considered "welfare benefit plans" under ERISA, and therefore are not subject to the "stringent vesting, participation and funding requirements" imposed by ERISA on pension benefit plans. [FN4] *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 585 (1st Cir.1993). In fact, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). This does not mean, however, that such plans can never vest. It is certainly possible *76 for an employer to "oblige itself contractually to maintain benefits at a certain level in ways that are not mandated by ERISA." *Vasseur v. Halliburton Co.*, 950 F.2d 1002, 1006 (5th Cir.1992). But such an obligation "is not to be inferred lightly." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 139 (3d Cir.1999). The First Circuit has instructed district courts that the "resolution of questions concerning employer obligations under such plans must be tailored to avoid undermining Congress' considered decision that welfare benefit plans not be subject to a vesting requirement." *Allen v. Adage, Inc.*, 967 F.2d 695, 698 (1st Cir.1992) (quotation marks omitted). In addition, several circuits require that employers agree to vested benefits in writing as part of the plan documents. *See Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir.1998) (collecting cases), *cert. denied*, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). With these principles in mind, the Court examines the facts of this case.

FN4. NSTAR, in passing, suggests that the PRP is not an ERISA plan and therefore cannot be the basis for a claim under Count II. NSTAR, however, only offers one case citation and no developed argumentation on this point. Accordingly, the argument is deemed to be waived. *See Rocafort*, 334 F.3d at 121.

Count II of the amended complaint alleges that the plaintiffs "were entitled under the terms of the Commonwealth Pension Plan to the level of retiree medical care that they received at the time of their retirement for the rest of their life." It is undisputed, however, that the terms of the Commonwealth Pension Plan explicitly excluded health care coverage. [FN5] Simply put, the plaintiffs have failed to identify any provision of the Commonwealth Pension Plan that provides vested lifetime health insurance coverage.

FN5. The Commonwealth Pension Plan states that "health care programs themselves are not part of this Plan and are not subject to the terms and conditions of this Plan and may be amended or terminated from time to time by appropriate officers of the Participating Company...."

The plaintiffs also claim as part of Count II that the PRP entitles them to a lifetime of vested health benefits. The PRP was a document that Commonwealth distributed to employees in 1997 when it decided to reduce its workforce. The PRP contained a section regarding health and dental care. This section defined eligibility criteria for participation in the company's health benefits program. [FN6] The plaintiffs claim that the eligibility requirements contained in the PRP amounted to promises of vested post-retirement health benefits. The crux of NSTAR's defense is that the eligibility requirements established by the PRP did not amount to vested post-retirement health benefits.

FN6. The eligibility criteria included the so-called "Rule of 75," which was a calculation based on a combination of the employee's age and years of service to the company.

[13][14] It is clear that defining the eligibility requirements for participation in a retiree welfare benefits plan is not the same as granting vested rights. *See Williams v. Caterpillar, Inc.*, 944 F.2d 658, 666-67 (9th Cir.1991) ("Retiree medical benefits do not become vested once an employee becomes eligible or retires."); *Howe v. Varity Corp.*, 896 F.2d 1107, 1110 (8th Cir.1990) ("[T]he mere fact that employee welfare benefits continue in retirement does not indicate that the benefits become vested for life at the moment of retirement."). The Court understands "vested" welfare benefits to be benefits that are "forever unalterable." *Sprague*, 133 F.3d at 400. In contrast, eligibility requirements merely

317 F.Supp.2d 69
317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774
(Cite as: 317 F.Supp.2d 69)

establish when or if a person may participate in a welfare benefits plan should an employer decide to offer one--keeping in mind, of course, that the plan "can be altered or terminated by an employer at any time." *77*Campbell v. BankBoston*, 206 F.Supp.2d 70, 75 (D.Mass.2002)*. This Court must enforce ERISA plans according to their "literal and natural meaning." *Harris*, 208 F.3d at 277-78 (citation and quotation marks omitted). Simply put, the literal and natural meaning of the eligibility requirements contained within the PRP is not equivalent to promises of forever unalterable health benefits. [FN7] See *Sprague*, 133 F.3d at 400 ("the intent to vest must be found in the plan documents and must be stated in clear and express language." (citation and quotation marks omitted)). Accordingly, the welfare benefit plans at issue here did not provide for a lifetime of unaltered health insurance coverage. The plaintiffs' claim for breach of plan provisions in violation of ERISA is dismissed.

> FN7. Even if the eligibility requirements contained in the PRP could be construed as promises of unalterable health benefits, it should also be noted that the PRP stated "[t]his summary is not intended to offer detailed descriptions of the System's employee benefit plans. All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plan. If any conflict arises between this summary and the System's employee benefit plan documents, or if any point is not covered, the terms of the appropriate plan documents will govern in all cases." As already explained in detail, the terms of the Master Medical, Medex and dental benefits plan explicitly provided that the plans could be changed or cancelled.

Lastly, NSTAR has moved to dismiss Plaintiff Joyce Baker for failure to prosecute because she has not responded to interrogatories served on August 1, 2003. In light of this Court's dismissal of all claims on summary judgment, NSTAR's motion regarding Joyce Baker is moot.

III. *CONCLUSION*

NSTAR's motion for summary judgment is granted on all counts.

SO ORDERED.

317 F.Supp.2d 69, 32 Employee Benefits Cas. 2774

**Motions, Pleadings and Filings** (Back to top)

· 1:03CV10530_____(Docket) (Mar. 25, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES J. SENIOR, NORMAN FAHY,  )
RONALD D. PHIPPS, RAYMOND         )
W. POSTMA, THOMAS G. HIRL         )
and UNITED STEELWORKERS           )
OF AMERICA, LOCAL 12004           )
                                  )
                  Plaintiffs,     )
                                  )          Civil Action No. 04-10160-EFH
v.                                )
                                  )
NSTAR ELECTRIC AND GAS            )
CORPORATION and                   )
COMMONWEALTH GAS COMPANY          )
                                  )
                  Defendant       )
                                  )

## REPORT OF EXPERT TESTIMONY BY CAROL CHANDOR

### I. Qualifications

My qualifications as an expert in this case. Currently I am the Managing

Director, CEO of a regional employee benefit consulting firm. My responsibilities

include managing the procurement process for our clients. My specific expertise is with

self-insured and fully insured medical and dental plans. As a consultant, I am responsible

for managing the medical and dental procurement process for my clients, and reviewing

all documentation relevant to the procurement. This includes reviewing the final

contracts including the schedule of benefits, employee communication materials,

Summary Plan Descriptions, and Plan Documents. In addition to these responsibilities, I

provide other consulting services on an ongoing basis. Previously, I have provided

consulting services to many large public and private sector accounts, including the

Commonwealth of Massachusetts Group Insurance Commission (Retiree Dental Plan

Procurement), EMCOR Group, Inc. (Medical and Dental Plan Procurement). Boston

1

Financial Data Services (Medical and Dental Plan Procurement) and the Plumbers Local 12 Health and Welfare Plan (Medical and Dental Plan Procurement). I was also consultant to the Massachusetts Public Employees Dental and Vision Health & Welfare Fund for over five years.

Prior to being a consultant I was the Large Case Underwriting Manager for two large insurance entities. In this capacity I had full responsibility for underwriting, training and management of the large case underwriting departments. In total, I have worked in the health and dental insurance community for approximately thirty years. I have provided expert testimony on five occasions and charge $250 per hour. Details of my experience and expert testimony can be found in the attached document.

## II. Statement of Opinions and the Reasons Therefore

1. Pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §1001, et seq. (ERISA), Commonwealth Gas Company had provided certain summary plan descriptions to employees and retired employees concerning group health and dental insurance plans. Some of these are appended hereto as follows:

A. Dental Protection Plan II for Commonwealth Energy System and Subsidiary Companies issued by Delta Dental Plan of Massachusetts, dated April 1, 1990. (Attachment A)

B. Master Medical Subscriber Certificate for Employees of Commonwealth Energy System and Subsidiary Companies, dated January 1, 1991. (Attachment B is excerpts)

C. Delta Premier II Subscriber's Certificate issued by Delta Dental Plan of Massachusetts, revised 1/94. (Attachment C))

2

D. Package of updated Summary Plan Descriptions sent to participants February

1997, including list of plans and the full text of the Plan Description for Dental Blue

Program 2 dated 2/1/93 (Attachment D)

2. These summary plan descriptions are typical of those used by health and dental

insurance providers in Massachusetts. They are prepared by the insurance providers,

Delta Dental Plan or Blue Cross Blue Shield of Massachusetts. The attachments do not

appear to be unique to Commonwealth Gas Company. Many employers who purchase

health and dental insurance coverage for their employees may use the same summary

plan description.

3. All of these summary plan descriptions include, on one of the last pages,

statements concerning termination of the plan. In the 1990 Delta Dental Plan (Attachment

A) the following appears, at page 17:

10. Termination of Your Contract

A. YOU OR YOUR PLAN SPONSOR MAY CANCEL YOUR
CONTRACT

Your plan sponsor may cancel your contract for any reason. You may
also cancel your contract through your plan sponsor.

In the Blue Cross Blue Shield Master Medical Plan summary plan description

(Attachment B), the following appears at page 42:

10. Termination of Your Contract

A. You or Your Plan Sponsor May Cancel Your Contract

Your plan sponsor may cancel your contract for any reason. You may also
cancel your contract through your plan sponsor. To do so, your plan
sponsor must give us notice in writing within 30 days of cancellation.

3

Similar language appears in the 1994 Delta Premier II subscribers certificate (Attachment
C), at page 15 and in the Dental Blue Program 2 Subscriber Certificate that was part of
the February 1997 mailing (Attachment D), at pages DB 16 and 17.

        4. The summary plan descriptions appended hereto are typical of those
issued by health and dental group insurance providers in Massachusetts. In preparing and
issuing summary plan descriptions Massachusetts health and dental insurers typically
include a provision allowing the plan sponsor (the employer who provides and purchases
the insurance coverage for its employees and retirees) to terminate the coverage at any
time.

     5. In its retirement incentive programs in 1997 and 1999 Commonwealth Gas
provided employees who participated with documents entitled "Information Relative to
Employee Benefits Upon Your Retirement Date. A sample document is Attachment E.
These documents included the following paragraph:

**B. Dental Insurance**
        Since you were age 40 and had 12 or more years of employment as of
January 1, 1993, you will be covered by the Company sponsored dental plan at
your Actual Retirement Date.

You will pay 10% of the current premium (the premium in effect as of the first of
the year in which you retire) from age 55 to age 62. When you reach age 62, the
Company will pay the entire premium.

Coverage for your spouse and/or eligible dependents will be provided.

*Your dental coverage will be for your life.* Your spouses and/or eligible
dependents will be covered for 12 months after your death. At the end of the 12
months, your spouse and/or eligible dependents will be offered continuation of
coverage through COBRA. [Emphasis supplied.]

     6. The same 1997 and 1999 documents given to participants in the retirement
program also contained the following paragraph:

4

### 9. Plan Documents

The retirement benefits outlined in this report are estimated. You will receive documentation from the Plan Agent confirming your retirement benefits upon retirement.

This summary is not intended to offer detailed descriptions of employee benefit plans. *All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plans. If any conflict arises between this summary and the System's employee benefit plan documents, of if any point is not covered, the terms of the appropriate plan documents will govern in all cases.* [Emphasis supplied.]

8. There is no conflict between the promise that "Your dental coverage will be for your life," in documents given to plan participants and the standard provision stated in the Summary Plan Description(s) that allows the plan sponsor to "cancel the plan" at any time.

Standard wording in an insurance contract, Summary Plan Description (SPD) or Plan Document allows a plan sponsor to terminate the *insurance* contract. In addition, it also allows the insurance vendor to terminate the contract based on certain conditions, such as non-payment of premium.

In this case, the language allows the plan sponsor to terminate their arrangement with a dental insurance company, and replace it with another insurer, which is often beneficial to the plan sponsor.

Employers and/or plan sponsors periodically review the cost, plan design and service levels of their insurers. Based on this review, they often release a Request for Proposal in order to seek more competitive bids for the plan that is currently being offered. To this end, the plan sponsor may terminate their contract with a dental insurer, replacing the dental coverage with an insurer that is offering a lower price, better service guarantee or expanded level of benefits. This standard termination clause does not

5

eliminate the obligation of the plan sponsor to offer the dental benefit to their employees and/or retirees if such agreement was made with those covered under the plan. In some cases, an agreement with participants includes the name of the insurer, i.e. Blue Cross of Massachusetts. If the name of the insurer is specified, the plan sponsor cannot change insurance vendors. This, however, was not the case in this situation. The documents provided to participants that were retiring in 1997 and 1999, do not refer to any particular "dental coverage", thus allowing the plan sponsor, Commonwealth Gas, to change dental insurance companies.

The document given to the plan participants in 1997 and 1999, however, clearly states that, "Your dental coverage will be for your life." It outlines the percentage of the cost the participant will pay for this coverage up until age 62, and states that, "... the spouse and/or eligible dependents will be covered for 12 months" after the participants death. It is clear that lifetime dental coverage is promised to the participant, and that the employer is guaranteeing this coverage. The standard termination clause in the Summary Plan Description and/or insurance contract does not eliminate this guarantee. It is intended to give the employer/plan sponsor flexibility when selecting its dental insurer, not eliminating their obligation to provide dental coverage for the life of the plan participant.

Respectfully submitted under the pains and penalties of perjury this 18th day of January 2005.

Carol S. Chandor

6

# CAROL S. CHANDOR

Boston Benefit Partners, LLC
One India Street, Suite 200
Boston, Massachusetts 02109
(617) 570-9100
cchandor@bosben.com

| | |
|---|---|
| 1998 to Present | Managing Director, CEO<br>Boston Benefit Partners, LLC<br>Boston, Massachusetts |
| 1994 to 1998 | Principal<br>O'Neill Finnogan & Jordan<br>Boston, Massachusetts |
| 1990 to 1994 | Managing Director<br>Sedgwick Noble Lowndes<br>Boston, Massachusetts |
| 1985 to 1990 | President<br>Benefit Concepts, Inc.<br>Dover, Massachusetts |
| 1982 to 1985 | Large Case Underwriting Manager<br>Paul Revere Insurance Company<br>Worcester, Massachusetts |
| 1979 to 1982 | Director of Underwriting<br>Safeco Insurance Company<br>R.E. Moulton, MGU<br>Marblehead, Massachusetts |
| 1975 to 1979 | Group Underwriter<br>Safeco Insurance Company<br>Seattle, Washington |

---

## EDUCATION

---

University of Northern Colorado, Greeley              Bachelor of Arts, 1974

---

## PROFESSIONAL ORGANIZATIONS

---

International Foundation of Employee Benefit Plans (IFEBP)

New England Employee Benefits Council (NEEBC)

## SIGNIFICANT PROFESSIONAL ACCOMPLISHMENTS

- Co-Founder of Boston Benefit Partners, LLC, a woman-owned employee benefit consulting firm. Boston Benefit Partners specializes in advising large, public and private sector employers on health insurance and other employee benefit programs. Client experience includes organizations such as the Commonwealth of Massachusetts; Cytyc Corporation; EMCOR Group; Boston Financial Data Systems; the Massachusetts Teachers Association; Local 12 Plumbers and Pipefitters Health & Welfare Fund; Public Consulting Group; The First Church of Christ, Scientist; Boston Private Bank; Empire Kosher Chicken; and Select Energy, Inc.

  Specific Client Responsibilities:
  - Manage the procurement process for life, disability, medical and dental plans.
  - Review and analyze bids received for life, disability, medical and dental plans.
  - Review and approve final contracts, Summary Plan Descriptions, and Plan Documents for life, disability, medical and dental plans.
  - Provide ongoing support for renewal negotiations with vendors, underwriting and large claim analysis, reserve calculations, service issues with vendors, state and Federal regulatory standards.

- Ms. Chandor began her underwriting career at Safeco Insurance Company, Seattle, WA. At Safeco, she developed underwriting and training methodologies for self-insured medical plans. In this capacity, she conducted national training programs for underwriters, sales representatives, brokerage and Third Party Administrators. In addition, she negotiated and implemented reinsurance contracts, and had responsibility for all pooling arrangements with reinsurance carriers. As the Large Case Underwriting Manager for a large national MGU (Managing General Underwriter) and the Paul Revere Insurance Company, she managed large case underwriting for new business and renewals, interfaced with the brokerage/sales departments, and approved Third Party Administrators.

- Expert Testimony
  - Board of Conciliation and Arbitration, Essex County Correctional Officers Association and the Essex County Sheriff's Department, November 19, 2004.
  - MLRC, Ashburnham-Westminster Teachers Association and the Ashburnham-Westminster School Committee, April 9, 2003.

- American Arbitration Association, Centerville / Osterville / Marsten Mills Fire Fighter Local 2346 and the Centerville/Osterville Marsten Mills Fire District, May 20, 2002.
- MLRC, United Educators of Pittsfield and the Pittsfield School Committee, May 18, 2001.
- Pittsfield
- Compensation: Two hundred and fifty dollars per hour for expert testimony.

- Special Consultant to the Committee for Healthcare, Spirituality and Healing, BI/Deaconess Hospital. Provided information and analysis regarding health care trends, employer programs, and underwriting analysis.

- Appeared as technical consultant for CNN addressing the cost issues surrounding technology and the American healthcare system.

- Served on the National Practice Committees for two international employee benefit consulting firms.