UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES J. SENIOR, NORMAN FAHY, )
RONALD D. PHIPPS, RAYMOND )
W. POSTMA, THOMAS G. HIRL, )
GARRETT M. FAGAN )
and UNITED STEELWORKERS )
OF AMERICA, LOCAL 12004 )
                                            Plaintiffs, )
v.                                           )    Civil Action No. 04-10160-EFH

NSTAR ELECTRIC AND GAS )
CORPORATION and )
COMMONWEALTH GAS COMPANY )
                                            Defendant )

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

This is an action by retired employees of Commonwealth Gas Company (the Company) and their bargaining representative, United Steelworkers of America, Local 12004 (Local 12004 or the Union) against Commonwealth Gas Company (the Company) and its corporate parent or successor, NSTAR Gas and Electric Corporation (NSTAR).[1] The plaintiffs seek relief for the unlawful reduction in retiree health benefits imposed on the retirees, their spouses and eligible dependents on or about April 1, 2003 by the defendant companies. On that date NSTAR ceased reimbursement of Medicare Part B premiums paid by the retirees and their spouses, which had been done since at least 1973. NStar also announced, in early 2003 that retirees and their spouses who were not age 65 by April 1, 2003 would lose their dental benefits when they reached age 65.

---

[1] In August 1999 the parent company of Boston Edison Company, BEC Energy, merged with Commonwealth Energy Systems (COM/Energy) and formed a new company, NSTAR Electric and Gas Corporation.

1

The Court's jurisdiction is based on section 301 of the Labor Management Relations Act, 29 U.S.C. section 185 (herein section 301), on section 502 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. section 1132, and on the doctrine of pendent jurisdiction.

## Statement of Facts

### A. Facts Concerning Medicare Part B Reimbursement Claim

#### 1. Employees Who Retired Under the 1973-1980 Agreements

Local 12004 and Commonwealth Gas Company were parties to a series of collective bargaining agreements (CBAs) beginning in 1973. The first three of those agreements, covering the period April 1, 1973 through March 30, 1980 contained the following provision:

> Medicare B. Reimbursement
> Any eligible employee or retiree who is age 65 years of age or over or whose spouse is age 65 or over, will be reimbursed an amount equal to the premium charged for Medicare Part B coverage for himself and/or his spouse.

CBAs for the years after April 1, 1980 did not include language providing Medicare Part B reimbursement for retired employees. (PSt. ¶¶1-3)[2]

Records provided by defendants show that a number of employees who retired between April 1, 1973 and March 30, 1980 survive. Included among them are James J. Pignataro, who retired on July 31, 1975, during the term of the 1975-1978 agreement. On February 12, 1974 he was given a document entitled "Estimated Retirement Benefits for James J. Pignataro" that described his retirement benefits. It included the following statement concerning health benefits:

---

[2] Reference to paragraphs of Plaintiffs' Statement of Undisputed Facts is indicated as "PSt __."

>   (4) <u>Health Insurance Benefits:</u>
>   When you reach age 65, you will automatically become covered under the provisions of Medicare Act, Part "A" which is the hospitalization portion of the coverage. However <u>you must sign up for Part "B"</u>, the medical portion, which is optional <u>at least 3 months prior to your 65th birthday</u> or you could have a serious gap in your coverage. Social Security will deduct a premium from your check each month for this part of your Medicare coverage. The Company will reimburse you for this in your pension check each month!
>   ...
>   <u>Note:</u> The above applies also to your spouse when he/she reaches age 65.

(PSt ¶ 14) Ralph C. Smith, Jr. retired from the Company on December 31, 1979, during the term of the 1978-1980 agreement. He had been provided a document like that given to James J. Pignataro, *supra*, that informed him that he and his spouse would be reimbursed for the Medicare Part B premium after retirement at age 65. (PSt ¶ 15)

### 2. Employees Who Retired April 1, 1980-March 30, 1993

Unlike health, dental and life insurance benefits, there has never been a document, SPD or otherwise issued by the Company describing the Medicare Part B reimbursement. (PSt ¶ 25) There is no reservation of rights in any document that specifically refers to Medicare Part B reimbursement. And, at least until 1997, no document stated to prospective retirees that the Medicare Part B reimbursement might be cancelled.

A number of employees of the Company retired between April 1, 1980 and March 31, 1993. Among them were Plaintiffs Garrett M. Fagan, Plaintiff Charles J. Senior and Patrick J. O'Brien.

Garrett M. Fagan retired on August 31, 1980. On June 12, 1980 the Company mailed him a statement to entitled New England Gas and Electric Association and Subsidiary Companies Information Relative to Employee Benefits Upon Reaching your Normal Retirement Age. (PSt ¶ 21) The document informed him of his pension calculations and other retirement benefits. It also provided that on retirement the

Company would reimburse him and his spouse for their Medicare Part B premiums when they reached age 65. (Ibid.) Carol Cormier, the representative of the Company's Human Resources department who spoke to retirees about their benefits on retirement, told him that the health insurance he had would cover him and his wife and dependents for his lifetime. (PSt at ¶ 21)

Patrick J. O'Brien is an employee of Commonwealth Gas who retired on January 1, 1991. He is not a named plaintiff. On November 30, 1990 he was given a statement by a company human rights representative entitled "Commonwealth Energy System and Subsidiary Companies, Information Relative to Employee Benefits Upon your retirement Date. It described his pension and insurance benefits on retirement and included a statement that he and his spouse would be reimbursed for their Medicare Part B premiums when they reached age 65. A document given him in 1988 stated, in handwriting: "Master Medical coverage for you and your wife to age 65, then Medex III coverage for life and Medicare A & B*" (PSt ¶¶ 16-18)

Plaintiff Charles Senior retired on January 1, 1993. When he was considering retirement he and his wife met with Carol Cormier, the Company's Human Resources representative. On September 14, 1992. Cormier gave him a document entitled "Information Relative to Employee Benefits Upon Your Retirement Date." It contained individualized information as to the amount of his pension, his pension payment options, and a statement that when he and his spouse reached age 65, "The company will reimburse you for the cost of Medicare Part B and there is no cost to you for Medicare Part "A." Cormier specifically told Senior and his wife that the Company would provide these benefits, including Medicare Part B reimbursement, for his life. Senior relied on

4

these promised benefits, including Medicare Part B reimbursement, in deciding to retire rather than continuing to work. (PSt ¶¶ 19-20)

Other employees who retired between April 1, 1980 and March 30, 1993 were given similar individualized statements concerning their retirement benefits, including promises of Medicare Part B reimbursement. (PSt ¶ 22)

### 3. Employees who Retired After April 1, 1993

The April 1, 1993-March 30, 1996 CBA included an agreement between the Company and Local 12004 that employees who were not age 40 and had 12 years of service as of January 1, 1993 "WILL NOT be covered by the COM/Energy sponsored Master Medical or Medex program at your retirement or termination." Employees who met those age and service requirements and who retired or terminated with the "Rule of 75" (with the System Companies) you WILL BE eligible for COM/Energy sponsored Blue Cross and Blue Shield Master Medical or Medex Plan." The agreement made no mention of Medicare Part B reimbursement. (PSt ¶ 8)

In negotiations leading to the 1993 CBA the Company's spokesman told the Union negotiators that under the terms of the agreement employees who were age 40 with 12 years of service as of January 1, 1993 would have no change in retirement benefits from those then in effect. (PSt ¶ 8) During those negotiations management representatives said nothing to the effect that health insurance benefits could be cancelled after retirement. (PSt ¶ 13)

After April 1, 1993 the Company continued to give employees considering retirement individualized documents like those given employees before, describing their pension and health benefits on retirement, including Medicare Part B reimbursement.

5

(PSt ¶ 22) However beginning sometime in 1997 employees considering retirement were given documents which made the following reference to Medicare Part B reimbursement:

> When you become eligible for Medicare, your medical insurance coverage will be through Medicare Part "A" and Part "B." Currently, the Company reimburses you for the cost of Medicare Part "B." There is no additional cost to you for Medicare Part "A" when you become eligible for the coverage…

(PSt ¶ 23) In early 2003 NSTAR Electric & Gas Company wrote all Commonwealth Gas retirees and informed them that "effective April 1, 2003, reimbursement for Medicare Part B will be discontinued." NSTAR explained that retirees of Boston Edison Company had never been reimbursed for Medicare Part B premiums.

### B. Facts Concerning Elimination of Dental Insurance for Retirees Who Were Not Age 65 as of April 1, 2003

(i) <u>The 1997 Personnel Reduction Program.</u> Prior to mid-1997 Commonwealth Gas provided employees considering retirement individualized statements describing their benefits on retirement. (PSt, Pyle Aff. Attachments D(A-H)) They generally included a statement as follows with respect to dental benefits:

> <u>Dental Plan Benefits</u>
>
> Your Dental Plan coverage will continue for you, your spouse and dependent children whether or not you reach age 65.

In 1997 Commonwealth Gas Company and Commonwealth Electric Company merged. It was decided that it would be necessary to reduce the work force, both management and labor. To accomplish this, without the ill will that would result from firing employees, the Company sought to attract employees to retire voluntarily. (PSt ¶ 26) It met with Local 12004 and, after discussion, a memorandum of agreement was entered into on May 23, 1997 that included the following paragraphs:

> It is mutually agreed and understood that effective May 13, 1997 the Company will offer the following Personnel Reduction Program to all employees that are members of [Local 12004].
> ....
> Employees who were at least age forty (40) and had completed at least twelve (12) years of System service as of January 1, 1993 and currently meet the "Rule of 75" will be entitled to medical and dental insurance providing they pay ten percent (10%) of the current medical and dental insurance premium until age sixty-two (62). At age 62 the Company will pay 100% of the premium.

(PSt ¶ 26) In discussions that led to this agreement management negotiators did not indicate that there could be any change in benefits (ibid.) or that the dental benefits could be cancelled or modified by the Company. (Laflash aff., ¶ 3)

During the negotiations for the memorandum union negotiators were shown a copy of a document announcing the 1997 Personnel Reduction Program (PRP) It was entitled "Personnel Reduction Program, Information for Commonwealth Energy System and Subsidiary Companies." It contained the same provision for medical and dental insurance as was in the memorandum agreement, quoted above. It did not contain the information about plan administration and employee rights required for a summary plan description (SPD) as set forth in ERISA, 29 U.S.C. § 1022(b). The document was distributed to employees of the Company. (PSt ¶ 27) The PRP Information document no provision indicating circumstances that might lead to termination or modification of the medical and dental benefits. It included the following paragraph near its end:

> Plan Documents ... The Last Word
>
> This summary is not entitled to offer detailed descriptions of employee benefit plans. All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plans. If any conflict arises between this summary and the System's employee benefit plan documents, or is any points not covered, the terms of the appropriate plans will govern in all cases.

7

Plaintiffs Fahy, Postma and other employees represented by Local who expressed an interest in the Personnel Reduction Program (PRP) were each given a document entitled "Information Relative to Employee Benefits Upon Your Retirement Date," with the employee's own name on the cover. The document contained individualized information for the employee, including his/her own pension calculation, life insurance, the employee's savings plan balance and severance plan balance. It also contained the following text concerning health and dental insurance:

INSURANCE

    A. Medical Insurance

        Since you were age 40 and had 12 or more years of employment as of January 1, 1993, you will be covered by the Company sponsored medical insurance plans at your Actual Retirement Date until you become eligible for Medicare. You will pay 10% of the current premium (the premium in effect as of the first of the year in which you retire) from age 55 to age 62. When you reach age 62, the Company will pay the entire premium.

        When you become eligible for Medicare, your primary medical insurance coverage will be through Medicare Part "A" and Part "B". Currently, the Company reimburses you for the cost of Medicare Part "B". There is no additional cost to you for Medicare Part "A" when you become eligible for the coverage. The Company provides a Medicare supplement which extends over and above those provided by Medicare. Currently, the Company pays the entire cost of the Medicare supplement.

        Coverage for your spouse and/or eligible dependent(s) will be provided.

        Your medical insurance coverage will be for your life. Your spouse and/or eligible dependents will be covered for 12 months after your death. At the end of the 12 months, your spouse and/or eligible dependents will be offered continuation of coverage through COBRA.

    B. Dental Insurance

        Since you were age 40 and had 12 or more years of employment as of January1, 1993, you will be covered by the Company sponsored dental plan at your Actual Retirement Date.

> You will pay 10% of the current premium (the premium in effect as of the first of the year in which you retire) from age 55 to age 62. When you reach age 62, the Company will pay the entire premium.
>
> Coverage for your spouse and/or any eligible dependent(s) will be provided.
>
> Your dental coverage will be for your life. Your spouse and/or eligible dependents will be covered for 12 months after your death. At the end of the 12 months, your spouse and/or eligible dependents will be offered continuation of coverage through COBRA.

Also included in the individualized information given to Fahy, Postma and the other participants in the 1997 program was the following paragraph:

> 9. Plan Documents
> ...
> This summary id not intended to offer detailed descriptions of employee benefit plans. All information furnished is governed by the provisions of the actual plan documents pertaining to the appropriate benefit plans. If any conflict arises between this summary and the System's employee benefit plan documents, or if any point is not covered, the terms of the appropriate plan documents will govern in all cases.

The document contained no reservation of a right for the Company to terminate or modify health or dental benefits. At a group meeting held to discuss the PRP Kenneth Margosian, president of the Company, told the group that the medical insurance and other benefits provided were for their lifetimes. At no time did any company representative tell plaintiffs Norman Fahy or Ronald Phipps that dental benefits could be changed by the company or drew attention to any other document that stated that the Company could terminate dental coverage.

(PSt ¶¶ 28, 30, 31) Plaintiffs Fahy and Phipps and about 11 other employees represented by the Union elected to accept the PRP. Fahy and Phipps retired in reliance on the benefits promised, including the promises of lifetime health and dental benefits. They executed the required releases of rights. (PSt. ¶¶ 28, 29)

At some time following their election to participate in the 1997 PRP, plaintiffs Fahy and Phipps and others who accepted the program received a 264 page document from the Company entitled "Participant Benefit Information." The 264 page document

9

was a series of SPD's for the Employee Savings Plan, the Master Medical Plan, the Blue Choice Plan, the Medex Plan, the Dental Blue Plan, the Life Insurance Plan and the Pension Plan. At page DB 33 of the Dental Blue Plan, under a heading "Your Rights," the following text appears:

> This section describes the Dental Blue Program 2 in general, If any conflict arises between this description and the Plan Document, or if we do not cover any point, the terms of the Plan document will always govern.
>
> The Company reserves the right, subject too the provisions of any collective bargaining agreement, to amend, modify or terminate the Plan at any time.
>
> Please refer to the Administrative Information section for all information related to the administration of this Plan.

(PSt ¶¶ 322, 33) Bernard Peloquin is the Director of Total Compensation at NSTAR Electric and Gas Company. From 1993 until the merger with NSTAR he was manager of employee benefits for Commonwealth Gas Company. When asked in a Rule 30(b)(6) deposition about the language of documents describing medical benefits on retirement used in the 1997 PRP (where the words "for life" were first used in connection with dental benefits for retirees), he said:

> Q. Could you tell us how that change came about?
>
> A. ... We looked at the whole thing, the whole disclosure, to people who were leaving the company. And at the time we had a lot of people leaving the company because of one of those programs. ... And this we felt was an accurate reflection of the benefit people would receive at that time.

(PSt ¶¶ 23, 24) Peloquin, testifying in the same deposition on behalf of the Company about the 1997 PRP (and the 1999 Voluntary Separation Program, *infra*) said that the individualized documents given to the employees promising, <u>inter alia</u>, lifetime dental benefits, were general forms, customized for the individual employee's situation. The purpose of these documents, he explained, was "to try to summarize at a high level the

10

benefits that [the employees] may be eligible for under the particular plans and plan documents ... [containing] certain elements of those plans to make it easier for them to review." (PSt ¶ 41) Asked why the Company told employees, in the individualized documents -- prepared, according to him, "to make it easier for employees to review" -- that dental coverage would be for their lifetimes and for the spouse and eligible dependents for 12 months after the retired employee's death, Peloquin responded (PSt ¶ 44):

> A. Well, the intent of this document was just to provide a brief summary of all of the employee benefit plans. They were not intended to be a detailed description of the employee benefit plans, and they can't be read in isolation of the other documents. ... [The statement of dental benefits for your lifetime] was accurate as of that particular point in time, but the company did retain the right to make changes to those plans ... It was applicable – it was for your life at that particular point in time, but it was subject to the plan documents and the company's ability to make changes.

ii) <u>The 1999 Voluntary Separation Program.</u> In 1999, as a result of the anticipated merger of Commonwealth Energy System with Boston Edison, there were redundancies that the company wished to address. It wanted to "reduce its [work] force on a voluntary basis as much as possible." (PSt ¶ 34) On July 26, 1999 the Company entered into a memorandum of agreement with Local 12004 that included the following provisions:

> It is mutually agreed and understood that effective August 4, 1999 the Company will offer the following Voluntary Separation Program (VSP) to all employees that are members of United Steelworkers of America, Local 12004.
> ...
> Employees who were at least age forty (40) and had completed at least twelve (12) full years of System service as of January 1, 1993 and currently meet the "Rule of 75" will be entitled to medical and dental insurance coverage providing they pay ten percent (10%) of the current medical and dental premium until age sixty-two (62). At age 62 the company will pay 100% of the premium.

(PSt ¶ 34) At no time in discussions preceding the execution of that memorandum did the Company representatives state or suggest that the health and dental benefits set forth in

11

the agreement could be cancelled or modified by the Company. Nor did the Company mention or refer to in any way to any provision of a dental insurance plan document that could limit the duration of the health and dental benefits that would be given to retirees. (PSt ¶ 34) Following execution of the 1999 memorandum the Company distributed to eligible employees a document entitled "Com/Energy 1999 Voluntary Separation Program for Employees Represented by Locals 333, 392 and 12004, Program Summary. The Program Summary stated that employees accepting the offer would receive a lump sum severance payment. An appendix listed "Other Benefits Information." It included the following statement

> Medical/Dental: For those employees who are eligible for post-retirement medical/dental benefits: Coverage will continue to employee and eligible dependents. Certain employees might be responsible for co-payment of premiums.

The Program Summary did not contain a reservation of rights to modify or terminate coverage. It had no statement of circumstances that could result in termination or modification of benefits. The appendix contained a sentence: "If any conflict arises between this summary and the System's employee benefit documents, or if any point is not covered, the terms of the appropriate plan documents will govern in all cases."

Plaintiffs Postma and Hirl and the other employee who considered participation in the 1999 program were given a document entitled "Information Relative to Employee Benefits Upon Termination of Employment," with their name of the cover. The form of the documents was virtually identical to that used in the 1997 PRP, including individualized pension calculations and options, and the same paragraph concerning plan documents. As in the 1997 PRP, the information document stated that the retiree would pay 10% of the current dental premium to age 62, that the company would pay the entire

premium thereafter and that, "Your dental coverage will be for your life." (PSt ¶ 36) Plaintiff Postma attended a group meeting at which Company benefits consultant Carol Cormier told him that "his medical and dental insurance would continue for the rest of his life, provided he paid 10 percent of the cost to age 62; after age 62 the Company would pay the premiums." Postma and Hirl met individually with Cormier to review the information documents. At no time was there mention of possible termination of dental benefits.

Plaintiffs Postma and Hirl elected to participate in the 1999 VSP, executed a release of rights and retired, in reliance on the promise of benefits made to them, including lifetime dental benefits. About 17 employees represented by Local 12004 who were eligible for retiree health and dental insurance elected to retire under the 1999 VSP. (PSt ¶¶ 37, 38)

iii) <u>Changes in Medical and Dental Coverage.</u> In the years since 1973 Commonwealth Gas often changed the medical and dental coverages for its employees. The Company changed benefits provided in the plans and changed employee co-payments. The 1990-1993 agreement provided coverage by Dental Services of Massachusetts, Inc. In 1994 the Company changed retiree health providers for retirees to Dental Blue, and in January 2000 the provider became Delta Dental. (PSt ¶ 43) An affidavit of Carol S. Chandor, an expert in insured employee medical and dental plans, states that the medical and dental summary plan descriptions used by Commonwealth Gas in recent years are typical. In preparing SPDs, Massachusetts health and dental providers typically include a provision allowing the plan sponsor (the employer who provides and purchases the benefits for employees and retirees) to terminate coverage at

any time. Employers regularly review their plans, plan design and levels of service and may change providers.

## Argument

I. EMPLOYEES WHO RETIRED UNDER THE 1973, 1975 AND 1978 AGREEMENTS ARE ENTITLED TO MEDICARE PART B REIMBURSEMENT FOR THEIR LIFETIMES

Under the First Circuit's decision in United Steelworkers of America v. Textron, 836 F2d 6 (1 Cir. 1987) the provisions for reimbursement of Medicare Part B premiums for retired employees in the contracts in effect from April 1, 1973 to April 1, 1980 are lifetime obligations on the employer. In Textron the CBAs provided that the company "shall pay" for retiree life insurance and that (specifically defined) medical benefits "shall be provided" to union members who retire. Then Judge Breyer authored the opinion that upheld a preliminary injunction requiring that retirees benefits continue. He wrote, 836 F.2d at 9:

> Plaintiffs have also shown a likelihood of success on the merits. The contract language – retiree medical benefits "shall be provided and the "Company shall pay" for retiree insurance – is consistent with a Textron promise to pay retirees' insurance costs throughout their retirement, even after the particular collective bargaining agreement expires. See, e.g. UAW v. Yard-Man, Inc., 716 F.2d 1476, 1480, (6th Cir. 1983), cert. denied, 465 U.S. 1007 (1984) ("will provide" supports this interpretation; Upholsterers International Union v. American Pad & Textile Co.372 f.2d 426 (same in regard to "will continue"). The Union adds that it would not make much sense for Textron to promise to pay retiree insurance costs for only the few years of the contract's actual life. See United Steelworkers of America v. Textron, [1987 WL 33023] (order granting preliminary injunction) ("If retirement lasts at all, it lasts for a life time [sic]."); cf. Yard-Man, Inc., 716 F.2d at 1482 (analogizing retiree benefits to "status" benefits which carry "an inference that they continue so long as the prerequisite status is maintained").

The Sixth Circuit's seminal decision in Yard-Man is based on reasoning that because retiree benefits are not mandatory subjects of bargaining[3] and retirees cannot depend for the security of their benefits on a union whose duty of fair representation runs to active employees, an inference arises that employees who retire with welfare benefits have assurance that the benefits will continue despite future contract changes.

Courts look for support in extrinsic evidence in these cases, see, Textron, supra, 836 F.2d at 9. Here employees considering retirement during the years 1973-1980 were given individualized statements describing their retirement benefits that told them that, "When you reach age 65 you will automatically become covered under the provisions of Medicare Part A ... However you must sign up for Part "B" ... Social Security will deduct a premium from your check for this part of your Medicare coverage. *The Company will reimburse you for this in your pension check each month.* (emphasis supplied) As the Textron court observed, it makes little sense to interpret the employer's promise to be confined to the duration of the particular contract. If the retiree does not reach age 65 until after the particular contract in effect at the time of retirement has expired, the promise of Part B reimbursement is wholly illusory.

In United Steelworkers of America v. Newman-Crosby Steel, 822 F.Supp 862 (D.R.I. 1993) the CBA provided that the Company "will pay the cost of providing life insurance ... on the life of each retired employee." The issue was whether that promise was good only for the term of the particular CBA or for life. There was some extrinsic evidence supporting the union's position that the contract intended lifetime coverage. Citing the reasoning in Textron, Judge Torres said: "Retiree benefits are generally considered to be "status" benefits that are expected to continue as long as the employee is

---

[3] Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass, 404 U.S. 157 (1971).

15

retired. ... They are sometimes described as a form of delayed compensation or reward for past services. ... Consequently, it is reasonable to infer that unless otherwise specified, retiree benefits are intended to continue for the duration of an employee's retirement. 822 F.Supp. at 866. (citations omitted)[4]

This case is governed by the First Circuit's decision in <u>Textron</u> and the district court's decision in <u>Newman Crosby.</u> Plaintiffs are entitled to relief under section 301 of the LMRA. They retired during the term of agreements that provided that retired employees would be reimbursed for the Medicare Part B premium. They were given statements before retiring indicating that if they retired they would be reimbursed for the Part B premium. They are entitled to the benefit of the <u>Yard-Man</u> and <u>Textron</u> inference that the promise of reimbursement was not for the term of the particular agreement, but for their lives. Accordingly, NSTAR violated their rights by terminating their reimbursements effective April 1, 2003 and they must be made whole and the reimbursements restored.

## II. PLAINTIFFS CHARLES J. SENIOR AND GARRETT FAGAN ARE ENTITLED TO HAVE THEIR MEDICARE PART B REIMBURSEMENT CONTINUED UNDER THE ERISA DOCTRINE OF PROMISSORY ESTOPPEL OR, ALTERNATIVELY, UNDER STATE LAW OF CONTRACT AND PROMISSORY ESTOPPEL

Although the CBAs after April 1, 1980 did not contain a provision for reimbursement of the Medicare Part B premium, Commonwealth Gas continued to promise employees, including plaintiffs Senior and Fagan, that if they retired the Company would reimburse them for the Medicare Part B premium. In the cases of Senior

---

[4] While courts outside the First Circuit do not all agree with the Yard-Man inference, those who have disagreed with the inference look to extrinsic evidence to inform the language of the agreement. See, e.g., Senn v. United Dominion Industries, 951 F.2d 806, 814-816 (7th Cir. 1992, cert. denied, 509 U.S. 903 (1993).

16

and Fagan, a representative of the Company's human resources department specifically informed them that their health insurance benefits would be for their lifetimes. (PSt ¶ 21)

The absence of a summary plan description for the Medicare Part B reimbursement does not prevent an employer's practice from being found to be an ERISA "plan." In <u>Wickman v. Northwestern Nat. Ins. Co.</u>, 908 F.2d 1077 (1Cir. 1990) the court quoted the oft-cited criteria set out in <u>Donovan v. Dillingham,</u> 688 F.2d 1367 (11th Cir. 1982): "In summary, 'a plan, fund or program' under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of funding, and procedures for receiving benefits." 688 F.2d at 1373. The <u>Donovan</u> court set out five essential constituents: "(1) a plan, fund, or program (2) established or maintained (3) by an employer or by an employee organization, or by both (4) for the purpose of providing medical, surgical, hospital care ... (5) to participants or their beneficiaries." <u>Id.</u>, at 1370. The company's practice of reimbursing retirees was not a one time action and it was not limited to a single employee, as was the case in <u>New England Mutual Life Ins. Co. v. Baig,</u> 166 F.3d 1 (1st Cir. 1999), where the employer reimbursed an employee for premiums paid by the employee on a disability insurance policy taken out by the employee. It was different from the kind of severance plans found not to be ERISA "plans" in <u>Belanger v. Wyman-Gordon Co.,</u> 71 F.3d 451 (1st Cir. 1995), <u>modified on other grounds,</u> 195 F.3d 65 (1st Cir. 1999) or <u>Radowicz v. Mass. Mut.Life Ins. Co.,</u> 192 F.3d 162 (1st Cir. 1999).

In <u>O'Connor v. Commonwealth Gas Company,</u> 251 F.3d 262 (1st Cir. 2001) the court ruled that a plan that was characterized as essentially a one-shot lump sum severance bonus was not an ERISA plan. The criteria mentioned in <u>O'Connor</u> include

"the nature and extent of the employer's benefit obligations," whether there is a complicated administrative apparatus either to calculate or to distribute the promised benefit." Id., at 268. The commitment to reimburse the employee for Part B premiums, which typically change each year, beginning when he/she reached the age of 65 and to reimburse the retiree's spouse when he/she reached that age, and to do so for the lifetime of the retiree does involve considerable administrative efforts. The administrative effort is greater than that involved in Simas v. Quaker Fabric Corp., 6 F.3d 849 (1st Cir. 1993), where the Massachusetts "tin parachute statute" was held to be an ERISA plan because it required severance pay for employees who lost their job during a twenty-four month election period, if not fired for cause. The court noted that "the time period [wa]s prolonged, individualized decisions [we]re required and at least one of the criteria [wa]s far from mechanical." While the element of individualized decisions is not present in the instant case, the fact that the time period was the employee's lifetime, that the spouse was also covered and that annual changes in the amount of deduction from the pension check will typically change, as well as the fact that the pension program is indisputably an ERISA plan, considered as a whole, make the Company's program of Part B reimbursements an ERISA plan.

    If the Court concludes that the claims of plaintiffs Senior and Fagan involve ERISA plans, they are entitled to relief. They retired under the terms of a plan that provided them lifetime reimbursement of Medicare Part B premiums. The extrinsic evidence supports their claim to lifetime benefits. In Textron and Newman Crosby the courts relied on oral statements made to the retirees to support their claims for lifetime insurance benefits. See, also, Automobile Workers UAW) v. BVR Liquidating, Inc. 190