F.3d 768, 771, n.6 (retirees' affidavits, including affidavit of an employee's wife, stated

that company agents told them that their health care would be lifetime benefits), Keffer v.

H.K. Porter, 872 F.2d 60, 64 (4 Cir. 1989), United Paperworkers v. Champion

International, 908 F.2d 1252, 1257 (5th Cir. 1990), Henglein v. Informal Plan for

Shutdown Benefits, 974 F.2d 391, 400-401 (3rd Cir. 1992) ("So long as they do not

modify the terms of a written plan, oral representations by a knowledgeable and

authorized management employee of he company may be evidence of a benefit plan,

especially if a representation incorporates by reference the terms of a document or other

plan .. where the oral remarks give evidence of a separate plan not precluded by the

written plan, the district court may credit the representations as evidence of a plan.")

> If the Court does not find that the promises of lifetime reimbursement of

Medicare Part B premiums made to Plaintiffs Senior and Fagan were ERISA plans, then

they were entitled to relief under Massachusetts state law estoppel principles. "The theory

of promissory estoppel , as embodied in the Restatement of Contracts § 90 (1932),

permits recovery if (1) a promisor makes a promise which he should reasonable expect

to induced action or forbearance of a definite and substantial character on the part of the

promise, (2) the promise does induce such action or forbearance, and (3) injustice can

only be avoided by enforcement of the promise." Loranger Construction Corp. v. E.F

Hauserman Co., 6 Mass. App. Ct. 152, 154 (1978), aff'd. 376 Mass. 757 (1978), Rhode

Island Hospital Trust Nat. Bank v. Varadian, 419 Mass. 841, 849 (1995) ("an action

based on reliance is equivalent to a contract action")

Accordingly, if the claim of plaintiffs Senior and Fagan is not cognizable under

ERISA, the Court should enforce the Company's promise of lifetime reimbursement of

Part B premiums under Massachustts contract and promissory estoppel law.


III.    THE COMPANY VIOLATED THE 1997 PRP AND THE 1999
VSP BY DISCONTIINUING DENTAL INSURANCE COVERAGE FOR
PLAINTIFFS FAHY, PHIPPS, POSTMA, HIRL AND OTHER LOCAL
12004 MEMBERS WHO RETIRED WITH RETIREE HEALTH BENEFITS

### A. The 1997 and 1999 Plans Are ERISA Welfare Benefit Plans

Plaintiffs Fahy, Phipps, Postma and Hirl are entitled to relief for the wrongful

termination of their dental benefits. The 1997 and 1999 memorandum agreements

between Local 12004 and the company, together with the 1997 and 1999 plan documents

given to them provided lifetime dental benefits.[5] The 1997 and 1999 retirement plans are

"welfare benefit plans" under ERISA. In Wickman v. Northwestern Nat. Ins. Co., 908

F.3d 1077 (1 Cir. 1990) the court quoted the oft-cited criteria set out in Donovan v.

Dillingham, 688 F.2d 1367 (11th Cir. 1982): "In summary, 'a plan, fund or program'

under ERISA is established if from the surrounding circumstances a reasonable person

can ascertain the intended benefits, a class of beneficiaries, the source of funding, and

procedures for receiving benefits." 688 F.2d at 1373. The Donovan court set out five

essential constituents: "(1) a plan, fund, or program (2) established or maintained (3) by

an employer or by an employee organization, or by both (4) for the purpose of providing

medical, surgical, hospital care ... (5) to participants or their beneficiaries." Id., at 1370.

The 1997 and 1999 plans meet these criteria.

---

[5] Employees have standing to sue to enforce agreements between their employer and the union that
represents them. Smith v. Evening News Assn., 371 U.S. 195 (1962).

In <u>O'Connor v. Commonwealth Gas Co.</u>, 251 F.3d 262 (1Cir. 2001) the Court of Appeals ruled that the 1997 PRP was not an ERISA plan. That case involved a suit by two employees who retired before the 1997 plan was announced. They claimed that they were misled into retiring before the effective date of the PRP. The Court of Appeals ruled that the PRP was not an ERISA welfare benefit plan; therefore the company owed no fiduciary obligation to the employees. In <u>O'Connor</u> the court viewed the severance bonus in the 1997 PRP as "the meat and potatoes of the plan. <u>Id.</u>, at 267. The court regarded the "other elements of the PRP – educational assistance, pension credit, and COBRA premiums [as] … little more than afterthoughts to the severance bonus. Compared to the severance, they would not likely have factored significantly into an employee's decision to retire early." <u>Id.</u>, at 268.

This case is far different because Mr. O'Connor did not qualify for the *lifetime health and dental benefits* promised the plaintiffs in this case.[6] In these days of rapidly rising health and dental costs, lifetime health and dental benefits have far greater value to an employee and his spouse than a fully taxable, one-time severance bonus. The security of lifetime health and dental benefits far outweighs the value of the one-time severance pay offered by the Company. There can be no question that plans that provide lifetime health and dental coverage fall well within the definition of an ERISA plan.

### B. NSTAR Violated the 1997 and 1999 Agreements and Plans in Terminating Dental Benefits for the Participants in those Plans

The 1997 and 1999 memorandum agreements between the Company and Local 12004 provided continued health and dental insurance for Local 12004 employees who had the requisite age and years of service. While they did not use the words "for life," the

---

[6] The opinion indicates that O'Connor would have received only payment of COBRA premiums for twelve months. <u>Id.</u>, at 270.

memoranda did provide that the employee would pay 10% of the then current medical and dental premium until age 62 and that the company would pay the full premium thereafter. And unlike the prior CBAs, which identified the specific health and dental policies and providers, the memoranda simply provided for "medical and dental insurance coverage," and made no reference to any particular health or dental policy.

Under the Yard-Man, Textron and Newman Crosby, supra, precedents the presumption or inference that collective bargaining agreements providing retiree benefits are for the retiree's life, rather than for the term of the agreement, strongly supports plaintiffs' position. Indeed, here the memorandum agreements had no specified duration. It does not make sense that the company could cut off benefits at any time after the employee retired. If the employer were to cut off health or dental benefits after age 62 the promise of free care after that age would be rendered meaningless.

Welfare benefits plans, unlike pension benefit plans, are not automatically vested for life. But it is well-settled that an employer may design a plan that provides welfare benefits for the life of a retiree. Yard Man, Textron, Newman Crosby, supra, In this case it is clear that Commonwealth Gas, in its effort to reduce its payroll and save millions of dollars in payroll costs, consciously decided to promise participants in the 1997 and 1999 severance programs that they and their spouses would have dental coverage for their lives. It was a powerful inducement.

In addition to the memorandum agreements, the employees were given two documents with information about the 1997 PRP. The first, the 1997 Personnel Reduction Program document, strongly suggested lifetime coverage. Employees who were age 40 and had 12 years of service as or January 1, 1993 and currently satisfied the Rule of 75

22

"will be entitled to medical and dental coverage providing they pay ten percent (10%) of the current medical and dental premium until age sixty two (62). At age 62 the company will pay 100% of the premium." The 1997 program benefit booklet indicated no duration for health and dental benefits and did not identify any circumstances which might result in disqualification, ineligibility or denial or loss of benefits, as is required of an SPD under ERISA, 29 U.S.C. § 1022. The booklet did not contain other information required of an SPD: name and type of administration, agent for service of process, plan procedures required to be followed in presenting claims, remedies available, etc.

Employees who indicated an interest in the 1997 PRP were given personalized documents that were reviewed with them by representatives of the Company's human resources department. For the first time in such documents given to prospective retirees the company used the words "will be for your life" in describing the health and dental benefits that would be provided for those who decided to retire. "Your dental coverage will be for your life." (Supra at pp. 8-9) "For your life" means just that. It does not mean "for your life unless the Company decides to change it," and the ordinary employee would quickly see and understand the difference. "Under ERISA, both summary plan descriptions and plan amendment summaries 'shall be written in a manner calculated to be understood by the average plan participant.' § 1022(a)(1)." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 1230-1231 (1995). It is a reasonable corollary, we submit, that an employer is charged with the reading of plan documents that the average plan participant would make.

The personalized documents were carefully drawn. For medical insurance benefits the Company raised a "red flag" concerning Medicare Part B reimbursement: "*Currently*

the Company reimburses you for the cost of Medicare Part "B." (emphasis supplied)
There was no such cautionary language related to lifetime dental coverage. The
personalized documents given to the prospective retirees were obviously intended to be
the primary focus of employees' attention when they weighed the advantages and
disadvantages of retiring. They explained exactly what the employee himself or herself
would receive.

The 1999 VSP was substantially identical to the 1997 document. The 1999 VSP
was announced in a program booklet (PSt, Attachment A) that did satisfy the formal
requirements for an ERISA SPD, 29 U.S.C. § 1022. There was scant reference in the
booklet to health and dental benefits. At page 4 one bullet point informed the employee:
"If you are eligible for post-retirement medical and dental coverage, you will receive
information from Human Resources-Benefits at the time of your termination." At page 8,
Appendix A it was stated that dental and medical coverage under COBRA is paid only
through the end of the month of termination. A further short statement said: "For those
employees who are eligible for post-retirement medical/dental coverage: Coverage will
continue to employee and eligible dependents. Certain employees might be responsible
for co-payment of premiums." There was no disclaimer and no language that indicated
circumstances under which health and dental benefits could be terminated.

Again in 1999 the focus of the Company's offer to the employee was contained
the personalized "Information Relative to Employee Benefits Upon Your Retirement
Date, Prepared for [Employee's name]." It was identical to the 1997 in its specific
promise of lifetime dental benefits for the life of the retired employee and for his/her
spouse for an additional year. It is crucial to note that the promise of dental coverage for

24

life was not attached to any specific dental plan or dental provider. The Company promised lifetime coverage, not lifetime coverage under a particular policy. The difference is highly significant. In <u>United Steelworkers v. Newman-Crosby Steel</u>, 822 F.Supp. 862 (D.R.I. 1993), the company, in contesting a lifetime insurance benefit claim, pointed to an SPD that allowed the policy to be terminated. The court responded: "The Court does not find these documents persuasive ... First, the [insurance] brochures merely describe the coverage purchased by the Company to fulfill its obligation under [the CBA]. They cannot and do not modify that obligation. The fact that the policy the Company chose to purchase may be terminable does not make the Company's duty to provide life insurance benefits terminable." <u>Id.</u>, at 865. <u>See also</u>, <u>In re Consolidated Mutual Life Insurance Co.</u>, 77 N.Y.2d 144 (N.Y. 1990), where the court ruled that a general right to terminate clause in a health insurance policy as only affected only the relationship between the employer and the insurer, and did not allow the employer to terminate promised coverage.

The opinion of Carol S. Chandor, an expert in insured employee medical and dental benefit plans (PSt, Attachment 18), shows that Massachusetts health and dental group insurance policies typically allow the plan sponsor (the employer who pays for the insurance coverage) to cancel the policy. Employers change policies and change insurance providers from time to time, as Commonwealth Gas has done over the years. The fact that the employer can terminate a particular policy -- where others are available – is not inconsistent with a promise to provide dental coverage for the life of the employee. Commonwealth Gas knew about disclaimers and reservations of rights, and it

could have qualified the lifetime promise, as it did, beginning in 1997 for Medicare Part B reimbursement, but it did not do so.

In construing ERISA plan documents, courts apply common sense canons of interpretation. Pizzzuti v. Polaroid Corp., 185 F.2d 12, 16 (1st Cir 1997), GCIU Employer Retirement Fund v. Chicago Tribune Co., 66 F.3d 862, 865 (7th Cir. 1995) ("we will give contract terms their 'ordinary and popular' sense and avoid resort to extrinsic evidence when faced with unambiguous language.") The ordinary employee reading the 1997 and 1999 personalized documents would give the words their normal meaning: The employee pays 10% of the current dental premium to age 62, after 62 the company pays the entire premium, and "your dental coverage will be for your life." There is simply no ambiguity.

NStar asks the Court to rule that the lifetime benefits were not for the life of the retiree because the dental insurance policy SPD that it used at the time contained a provision allowing the Company to terminate that particular policy. As we have shown, that language, buried in a 264 page series of a collection of SPD's, is not inconsistent with the Company's promise of lifetime dental coverage because the Company did not promise the retiree Dental Blue coverage under the then current policy, or any other particular dental provider or policy. The Company may, as it has in the past decades, continue coverage with a different policy or a different provider, as long as the benefits are maintained for the retiree's lifetime. In any event, no reasonable employee would work his way through that book to understand his/he rights under the Company's retirement offer.

The Company had "a fiduciary duty as a plan administrator not affirmatively to mislead participants. ...Lying is inconsistent with the duty of loyalty owed by all

fiduciaries and codified in section 404(a)(1) of ERISA." "[I]n the exercise of his duties, the fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed." "Put simply, when a plan administrator speaks, it must speak truthfully." Center v. First International Life Ins. Co., 1997 WL 136473 (D. Mass. 1997) (internal citations omitted) Employees may reasonably expect that their employer will be straightforward and not devious in presenting the terms of an early retirement proposal and its insurance components. It is simply not reasonable to expect an employee, without notice, to read all of the 264 pages of the several insurance policies in order to understand the employer's separation offer. "[A] participant has to read and understand the policy in order to make use of the summary, then the summary is of no use at all." Hansen v. Continental Life Ins. Co., 940 F.2d 971, 981-982 (5th Cir. 1991). "[T]he statue contemplates that the summary will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary. To allow the Plan to contain different terms that supersede the terms of the booklet would defeat the purpose of providing the employees with summaries." Heidgerd v. Olin Corp., 906 F.2d 903, 907-908 (2nd Cir. 1990). "It is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document, and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet." McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir. 1985). We understand that the courts in these cases have dealt with summary plan descriptions, while the personalized documents given the employees in this case do not meet the formal requirements of an ERISA SPD. But the point is the same. In fact,

27

the individualized documents are designed to and in fact do say to the employee that the Company has looked at your situation and you will have lifetime dental coverage if you retire.

In some cases the document promising health or dental insurance "for life" has no reservation of rights, but the employer has relied on another document which has prominent reservation of rights language. In such cases courts will normally look only to the document which promises lifetime benefits, unless that document is an amendment to an agreement or policy or unless the employee's attention is specifically directed to the document with the reservation of rights. In Diehl v. Twin Disc, Inc., 102 F.3d 301 (7th Cir. 1996) a shutdown agreement unambiguously and explicitly granted health insurance and life insurance "for the lifetime of the pensioner." The employer argued that the shutdown agreement incorporated, by its own terms, an insurance agreement, which in turn incorporated the reservation of rights language in insurance booklets. The court rejected that argument and said, 102 F.3d at 306-307:

> We respectfully do not believe that the Shutdown Agreement can be read to have incorporated unmodified the "change or discontinue" language contained in the insurance booklets. What the interpretation urged by [the employer] ignores is that the Shutdown Agreement itself was an independent contract, supported by separate consideration and capable of modifying or supplanting prior contractual arrangements.
>
> It is true than when potentially conflicting provisions coexist within the same document, or within a single contract formed of several documents, the rule that contractual provisions be read as integrated parts of an integrated whole will lead a court to seek an interpretation that reconciles those provisions. See, In re Unisys Corp. Retiree Medical Benefit "ERISA" Litigation, 58 F.3d 896, 904 (3rd Cir. 1995). …
>
> This is not true for the Shutdown Agreement, which unambiguously granted lifetime benefits to the retirees and then referred to the 1983 agreements for the purpose of identifying their level of benefits. The Shutdown Agreement was not executed in temporal proximity to either the 1983 Insurance Agreement or the preceding insurance booklets, nor did the Shutdown Agreement share with this earlier agreement a common underlying consideration.

28

Compare, Vallone v. CNA Financial Corp., 375 F.3d 623 (7th Cir. 2004) (the VSRP plan

was an amendment of the retirement plan, which contained a reservation of rights clause)

and UAW v. Rockford Powertrain, Inc., 350 F.3d 698,704 (7th Cir. 2003) (lifetime

benefits granted in same document with reservation of rights clause). Finally, in Deboard

v. Sunshine Mining & Refining Co. 208 F.3d 1228 (10th Cir. 2000), amended 2000 U.S.

App. Lexis 8639 (2000), the court upheld retirees claims for lifetime benefits under a

retirement plan that did not include a reservation of rights clause, although other

retirement plans has included such a provision.

Here the 1997 and 1999 retirement plans were new and different retirement

incentive programs. They were separate and apart from normal retirement under existing

employer policies. Commonwealth Gas received a new and separate consideration –

reduced payroll costs -- for the employees' retirements. The personalized documents

given to the employees by Commonwealth Gas unambiguously promised lifetime dental

coverage for the employee and an additional year for the employee's spouse. The dental

SPD was not part of the plan. It was not referred to in the plan. It was simply the means

then used by Commonwealth Gas to provide the coverage.

If the Court does not find that the promises of lifetime reimbursement of

Medicare Part B premiums made to plaintiffs Fahy, Phipps, Postma and Hirl were ERISA

plans, then they were entitled to relief under Massachusetts state law estoppel principles.

"The theory of promissory estoppel, as embodied in the Restatement of Contracts § 90

(1932), permits recovery if (1) a promisor makes a promise which he should reasonable

expect to induced action or forbearance of a definite and substantial character on the part

of the promise, (2) the promise does induce such action or forbearance, and (3) injustice

29

can only be avoided by enforcement of the promise." <u>Loranger Construction Corp. v. E.F</u>

<u>Hauserman Co.</u>, 6 Mass. App. Ct. 152, 154 (1978), <u>aff'd.</u> 376 Mass. 757 (1978), <u>Rhode</u>

<u>Island Hospital Trust Nat. Bank v. Varadian</u>, 419 Mass. 841, 849 (1995) ("an action

based on reliance is equivalent to a contract action")

Accordingly, if the claim of the 1997 and 1999 plan plaintiffs are not cognizable

under ERISA, the Court should enforce the Company's promise of lifetime dental

coverage under Massachusetts contract and promissory estoppel law.


## Conclusion

The Court should grant plaintiffs' motion for summary judgment as follows:

1. The employees who retired during the terms of the 1993, 1975 and 1978

collective bargaining agreements, and their spouses, are entitled to reimbursement of

Medicare Part B premiums for their lives.

2. Plaintiffs Senior and Fagan, and their spouses are entitled to reimbursement of

Medicare Part B premiums for their lives.

3. Plaintiffs have established, by undisputed facts, that NSTAR violated the terms

of the 1997 and 1999 voluntary retirement plans for employees of Commonwealth Gas

when it declared in early 2003 that employees who retired under those agreements and

their spouses would not have dental insurance if they had not reached age 65 by April 1,

2003. The Court should grant plaintiffs summary judgment. NSTAR should be ordered to

make the plaintiffs whole for their losses and restore their dental benefits for their

30

lifetimes and for their spouses and eligible dependents for an additional year after the

retiree's death.[7]

> Respectfully submitted:
>
> CHARLES J. SENIOR, NORMAN FAHY,
> RONALD D. PHIPPS, RAYMOND
> W. POSTMA, THOMAS G. HIRL,
> GARRETT M. FAGAN and UNITED
> STEELWORKERS OF
> AMERICA, LOCAL 12004
>
> By their attorneys,
>
> _Warren H. Pyle_
> Warren H. Pyle, BBO # 408400
> Pyle, Rome, Lichten, Ehrenberg
>      & Liss-Riordan, P.C.
> 18 Tremont Street, Suite 500
> Boston, MA 02108
> Tel: (617) 367-7200

Dated: March 4, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of record, by hand delivery, on March 4, 2005.

> _Warren H. Pyle_
> Warren H. Pyle

---

[7] Courts award retroactive benefits and the reinstatement of benefits. See, e.g., Canseco v. Construction Laborers Pension Trust, 93 F.3d 600, 610 (9th Cir. 1996) (ordering retroactive retirement payments); Govindarajan v. FMC Corp., 932 F.2d 634, 636 (7th Cir. 1991) (upholding district court's order of retroactive reinstatement of benefits); Mine Workers v. Nobel, 720 F.Supp 1169 (W.D.Pa. 1989) (ordering retroactive and prospective benefit payments), aff'd. mem. 902 F.2d 1558 (3d Cir. 1990), cert. denied, 499 U.S. 904 (1991).