```
                                                               1

 1                          VOL. 1, PAGES 1 - 132
 2                 UNITED STATES DISTRICT COURT
 3                  DISTRICT OF MASSACHUSETTS
 4    Civil Action No. 03-10530-EFH
 5    -----------------------------------------
 6    UTILITY WORKERS, LOCAL 369, et al.,    )
 7                   Plaintiffs              )
 8    v.                                     )
 9    NSTAR ELECTRIC AND GAS CORPORATION,    )
10                   Defendant               )
11    -----------------------------------------
12
13           DEPOSITION OF CAROL CORMIER
14             Monday, November 10, 2003
15                    10:09 a.m.
16              Morgan, Brown & Joy, LLP
17                 One Boston Place
18            Boston, Massachusetts 02109
19
20                    *********
21
22
23       Reporter: Lauren M. Mitchell, CSR, RPR
24
```

2

```
 1   APPEARANCES:
 2          Segal, Roitman & Coleman
 3          Paul F. Kelly, Esq.
 4          Stephanie Pratt, Esq.
 5          11 Beacon Street, Suite 500
 6          Boston, Massachusetts  02108
 7          (617) 742-0208
 8          Counsel for the Plaintiffs
 9
10          Morgan, Brown & Joy, LLP
11          Keith Muntyan, Esq.
12          One Boston Place
13          Boston, Massachusetts  02108
14          (617) 617-523-6666
15          Counsel for the Defendant
16
17   ALSO PRESENT:  Bernard Peloquin
18
19
20
21
22
23
24
```

```
                              3
 1                I N D E X

 2

 3   WITNESS                              PAGE

 4   CAROL CORMIER

 5   BY MR. MUNTYAN:                      4, 125

 6   BY MR. KELLY:                        74, 129

 7

 8                E X H I B I T S

 9   Exhibit 1, Information Relative To Employee

10   Benefits Upon Your Retirement Date,

11   regarding Suzanne Dupont......................... 52

12   Exhibit 2, Information Relative to Employee

13   Benefits Upon Your Retirement Date,

14   regarding Vincent A. Crowley.................... 52

15   Exhibit 3, personnel reduction program......... 114

16   Exhibit 4, Company Proposal Union

17   Consolidation Agreement, memorandum of

18   agreement....................................... 114

19

20

21

22   ***EXHIBITS MARKED DURING THIS DEPOSITION

23       ARE ATTACHED TO THE DEPOSITION TRANSCRIPT.

24
```

1           PROCEEDINGS

2           MR. MUNTYAN: Paul, if we can use the
3   same stipulations, we'll ask Lauren to put those in.
4           MR. KELLY: That's fine
5           It is agreed by and between counsel for
6   the respective parties that all objections, except
7   as to form, and motions to strike will be reserved
8   until the time of trial; that the witness will read
9   and sign the deposition transcript under the pains
10  and penalties of perjury; and that the sealing and
11  filing of the deposition transcript is waived.
12          CAROL CORMIER,
13  a witness called for examination by counsel for the
14  Defendant, NSTAR ELECTRIC AND GAS CORPORATION, being
15  first duly sworn, was examined and testified as
16  follows:
17  EXAMINATION BY MR. MUNTYAN:
18      Q.  Good morning, Ms. Cormier.
19      A.  Good morning.
20      Q.  I don't believe we've met before. My name
21  is Keith Muntyan. I represent NStar in this
22  litigation with Local 369.
23          And my purpose in asking you to come in
24  this morning is so I could ask you about your

1  Q. All right. And when you first joined Comm.
2  Gas, what position did you hold?
3  A. I was a clerk in the meter-reading
4  department.
5  Q. And maybe it would be good if I just ask you
6  to kind of keep going forward in time -- we'll come
7  back and ask more specific questions about the
8  things you did, but if you could first give me an
9  outline how long you were a clerk in meter-reading
10 and what you moved into after that?
11 A. Can I look at my notes?
12 Q. Fine with me, if Mr. Kelly doesn't mind.
13 A. My resume, that I never sent to anybody.
14 It's just for the dates.
15 Q. Okay.
16 A. Okay. So, from August of 1978, when I was
17 hired, until July of 1980, I was a clerk in both the
18 meter-reading department and then the appliance
19 rental department. Those were Union positions.
20 Q. Okay.
21 A. And then in July of 1980 through July of
22 1986, I was a human resources assistant. And during
23 that time, I helped with both personnel and labor
24 relations issues.

1  Q. Okay. Who did you report to between '80 and
2  '86?
3  A. Victor DiNardo.
4  Q. Okay.
5  A. And then in September of 1987 through
6  October of 1997, I was the supervisor of payroll and
7  employee benefits at Commonwealth Gas.
8  Q. And this was at Southborough?
9  A. In Southborough.
10 Q. Okay. And when you first took on that job
11 in September '87, do you remember who you were
12 reporting to?
13 A. Victor DiNardo, still.
14 Q. Okay. Did that change over the 10 years?
15 A. No.
16 Q. All right. And then what happened October
17 of '97?
18 A. And then in October of 1997, I became a
19 benefits coordinator at Comm. Energy Services
20 Company, in Cambridge.
21 Q. All right. And to whom did you report when
22 you began that work?
23 A. Bernard Peloquin.
24 Q. And how long did you hold that position?

1   A. Well, I held that through the merger with
2   Boston Edison.
3       So, that happened in August of '99 was
4   the merger.
5   Q. Right.
6   A. So, I stayed in that position through July
7   of 2000, after that merger.
8   Q. So, up through July of 2000, you continued
9   to serve as a benefits coordinator at corporate?
10  A. Yes.
11  Q. All right. And did something change then
12  July of 2000?
13  A. That's when I left NStar and -- well, I
14  remained as a consultant with Alpha Personnel
15  through December of 2001.
16  Q. December of '01, okay.
17      And then what took place?
18  A. And then I left.
19  Q. Okay. Left Alpha?
20  A. Yes.
21  Q. Okay.
22  A. And NStar.
23  Q. And have you worked since then?
24  A. No.

17

1   it's 338 or 339, I can't remember at this point.
2       Q. Fair enough. That won't create any problem.
3           MR. MUNTYAN: Off the record.
4           (Discussion off the record.)
5       Q. Starting with the fall of 1986, when you
6   became supervisor of payroll and employee benefits,
7   would you describe what your duties were in that
8   job?
9       A. I had both the payroll -- there were three
10  people under me that I was supervising. And one was
11  the day-to-day payroll issues that came up for
12  Commonwealth Gas Company that had to be resolved
13  with, you know, with a clerk that was helping.
14      Q. Okay.
15      A. And under the benefits, it was to administer
16  all of the benefits with the employees at that
17  level; not at the corporate level but at the level
18  of day-to-day contact with employees, and questions
19  about benefits and so forth.
20      Q. Okay. And when you distinguish between that
21  level and the corporate level, could you say a
22  little more about what you did and didn't do; what
23  things would be perhaps reserved corporate?
24      A. The choice of benefit plans, which companies

1  that they used, the high level of decision-making.
2     Q.  All right.
3     A.  But the administering of all of the plans
4  was at my level.
5          And the communication of those benefits
6  and plans to employees was at my level.
7     Q.  Okay.  Did that continue to be the case for
8  the full, looks like 11 years that you were
9  supervisor of payroll and employee benefits?
10    A.  Yes.
11    Q.  In assisting employees with benefits issues,
12 was one of your functions ever to attend a type of
13 meeting that was referred to as a Ready Or Not?
14    A.  Yes.
15    Q.  And what were the Ready Or Not meetings?
16         What was their purpose?
17    A.  The purpose was to inform employees that
18 were approaching retirement about issues regarding
19 retirement, such as the benefits that the Company
20 would provide, Social Security, even just a
21 lifestyle change of going into retirement, to give
22 them -- there was health issues.
23         So, it was information given to retirees
24 so that they would be prepared to make a decision,

1  heard Mr. Peloquin do?
2      A.  Yes.
3      Q.  Okay.  But should I understand from your
4  comment a moment ago that that did not mean that at
5  every Ready Or Not, there was a specific comment
6  made to the folks there that, indeed, health
7  benefits were not guaranteed to stay just as good
8  throughout the employee's life as they were the day
9  the employee retired?
10     A.  Yes.
11     Q.  So, what I wanted to ask about then was, in
12 the other context in which you discussed benefits in
13 retirement with employees -- not the Ready Or Nots,
14 but the one-on-ones where Comm. Gas folks might come
15 and speak to you -- by the latter few years that you
16 were in the supervisor's position there, '95, '6,
17 '7, if an employee asked you a question about their
18 benefits in retirement and whether they were
19 guaranteed to stay just as good throughout the
20 employee's retirement as they were the day he
21 retired, how would you answer that question?
22     A.  If they asked the question, I would have
23 told them that they're not guaranteed, and they
24 could possibly change.

1  under the plan.
2         Is that your recollection?
3     A. Yes.
4     Q. All right. And if it wasn't for the PRP,
5  that may have been for the 1999 time frame?
6     A. Right.
7     Q. All right. Beyond that change, which may
8  have applied to one or the other, '97 or '99, were
9  the health benefits in retirement unchanged under
10 both the '97 and '99 plans, as far as you recall?
11    A. Yes. They were unchanged.
12    Q. We talked about this disclaimer that's at
13 the back of the plans for Master Medical.
14        And you said that you thought that that
15 same language or something very like it appeared in
16 other summary plan descriptions as well, correct?
17    A. Yes.
18    Q. Do you recall ever having a discussion with
19 any Company employee about that language in any of
20 the summary plan descriptions?
21    A. No. I don't recall.
22    Q. Do you recall any employee ever asking you a
23 question about it?
24    A. No.

```
 1        Q.  And as far as you recall, you never directed
 2   any employee's attention to that disclaimer
 3   language?
 4        A.  No, I didn't.
 5        Q.  Okay.  Do you have any recollection of being
 6   acquainted with a gentleman who worked for Comm. Gas
 7   named Henry Kautser, K-a-u-t-s-e-r?
 8            I may be mispronouncing his name.
 9        A.  K-a-u-t-s-e-r, it doesn't ring a bell.
10        Q.  I may be mistaken thinking he worked at
11   Comm. Gas, but somewhere in the Comm. System, a
12   person by that name doesn't ring a bell right now?
13        A.  No.
14        Q.  Let me try a different name then.
15            Was there a Henry K-n-a-u-t-s-e-n?
16        A.  Yes.
17        Q.  Where did Mr. Knautsen work?
18        A.  For Comm. Gas, yes.
19        Q.  Now, do you have a recollection of making a
20   statement to Mr. Knautsen that, in substance,
21   conveyed the following -- maybe not word for word,
22   in other words, but in substance -- conveyed that if
23   he retired at the time he was considering, which was
24   October of 1997, all of his medical benefits would
```

1   remain as they were then for his lifetime; and that
2   no co-pays or future changes would affect his
3   medical plan during his lifetime?
4       A.  I would not have said no co-pays or future
5   changes.  I would not have said that part of the
6   statement, but I would have said that he would have
7   had the coverage for his lifetime; that he would
8   have medical coverage for his lifetime.
9       Q.  Okay.  And if you had said to him or another
10  employee that they would have medical coverage for
11  their lifetime --
12      A.  Yes.
13      Q.  -- would that have meant something different
14  from they would have exactly and precisely the
15  medical coverage that they had on the day of their
16  retirement for their lifetime?
17      A.  No.  It would not have meant that they had
18  it because, for one thing, it changes when they go
19  on Medicare.
20          So, it wouldn't necessarily mean that
21  exact plan, because it does change when you go to a
22  different plan.
23      Q.  Okay.
24      A.  And also, Master Medical might not be a

1  product that is offered by an insurance company.
2           So, it did not mean that it was that
3  particular plan, but there would be medical coverage
4  for his lifetime.
5     Q.  Okay.  Now, you pointed out a couple of ways
6  in which there could be changes; Blue Cross could
7  make a change, and at 65, everyone does have an
8  adjustment as they become eligible for Medicare,
9  say, but what about the kind of change that -- well,
10 let me ask it this way.
11          In the disclaimer, it says that the
12 Company reserves the right to amend, modify or
13 terminate the plan.
14          In your understanding of the situation,
15 say, as of 1997, when you were talking with
16 Mr. Knautsen, were the only kinds of changes that
17 you thought were possible changes like switching
18 from the Blue Cross product to Medicare or a change
19 that Blue Cross imposed because they changed the
20 plan?
21          What I'm getting at is, he says that he
22 understood from you that there could never be
23 co-pays or other changes in his benefits.
24          And I'm not sure whether what you said a

1  moment ago means that the Company could make
2  adjustments, and you were aware of that, or simply
3  that there were some things that were built in that
4  were possible changes in the future.
5          Am I making sense?
6          Do you follow my question?
7     A.  Yes.  I would not have been specific with
8  him, or anybody else that was retiring, to say,
9  specifically, the Company can eliminate Master
10 Medical and bring in another plan or -- I would not
11 have been specific about that.
12    Q.  All right.
13    A.  Or to say the Company has the right to do
14 that.  I would not have said that.
15    Q.  All right.  And so, you would not have
16 pointed that out?
17    A.  Right, right.
18    Q.  Would you have said something inconsistent
19 with it, such as, there could never be such a
20 change?
21    A.  No.  I would never have said that either.
22    Q.  Now, I think last April, the Company did
23 make some changes which, I'll represent to you, it
24 believes it had the right to make, and which the