1                    VOL. 1, PAGES 1 - 132

2           UNITED STATES DISTRICT COURT

3            DISTRICT OF MASSACHUSETTS

4    Civil Action No. 03-10530-EFH

5    --------------------------------------

6    UTILITY WORKERS, LOCAL 369, et al.,    )

7                 Plaintiffs              )

8    v.                                   )

9    NSTAR ELECTRIC AND GAS CORPORATION,   )

10                Defendant               )

11   --------------------------------------

12                     .

13            DEPOSITION OF CAROL CORMIER

14           Monday, November 10, 2003

15                 10:09 a.m.

16           Morgan, Brown & Joy, LLP

17               One Boston Place

18         Boston, Massachusetts 02109

19

20                 * * * * * * * *

21

22

23        Reporter: Lauren M. Mitchell, CSR, RPR

24

Page 26

1  part of the formal presentation.
2  Q. Okay. Do you recall being asked questions
3  ever by employees or spouses about whether, after
4  they retired, their pension benefits could be
5  changed or reduced?
6  A. At the Ready Or Not sessions?
7  Q. Yes, yes.
8  A. I can't remember specifically that, being
9  asked that.
10  Q. Okay. Did you have an understanding during
11  the period when you were the supervisor of payroll
12  and employee benefits as to what the answer to such
13  a question should have been?
14  A. Yes.
15  Q. And what would that have been?
16  A. That they can't be reduced.
17  Q. They cannot?
18  A. Right.
19  Q. Do you recall hearing Ms. Hayes or anyone
20  else who either presented information on health
21  insurance in retirement or answered questions that
22  might have come up on that subject making statements
23  to employees at the Ready Or Not sessions regarding
24  whether health benefits could change after a person

Page 28

1  management personnel, such as yourself and Ms.
2  Hayes, who were making the presentation?
3  MR. KELLY: Objection; foundation as to
4  Ms. Hayes.
5  MR. MUNTYAN: Okay. Yes, you're right.
6  Q. Let me just ask about yourself first.
7  A. Okay.
8  Q. Did you make any assumption -- and let me
9  focus in on the first year you're in that
10  supervisor's position.
11  Did you make any assumption or have any
12  belief as to whether health insurance benefits of
13  retirees could be changed after they retired?
14  A. My own knowledge of it?
15  Q. Yes.
16  A. No, I did not. I thought that they would --
17  I never gave it a thought. Nobody put the thought
18  in my head that they would change.
19  Q. All right, all right.
20  And had anyone ever said to you that
21  they affirmatively would not change; that whatever
22  those benefits were upon a retiree's retirement were
23  fixed forever?
24  A. There was a feeling that was the way it was.

Page 27

1  retired?
2  A. You're asking specifically about when Betty
3  Hayes was doing the presentation?
4  Q. Let's start with that.
5  A. Okay.
6  Q. And do you recall whether Betty Hayes ever
7  said to folks at a Ready Or Not that health
8  insurance benefits that they received after they
9  retired were either guaranteed to never change for
10  the rest of their life or could change at some point
11  after their retirement; anything on that issue?
12  A. I don't think she ever said they were
13  guaranteed never to change. I don't think it came
14  up at all.
15  Q. Okay.
16  A. The only changes that we had made were
17  increases to the benefits. I don't think anybody
18  thought that they would decrease benefits.
19  So, I don't think that question really
20  was raised at Ready Or Not when Betty Hayes was
21  doing the presentations.
22  Q. All right. And when you say you don't think
23  anybody really thought they could be reduced, is
24  that a fair statement about the assumption of the

Page 29

1  The reason why I told you that is
2  because when there were slight changes in the plan,
3  a co-pay went from $3 to $5, the retirees didn't
4  receive that change, because that was an increase
5  that they hadn't had when they were working.
6  Q. They stayed as they had been?
7  A. They stayed at three, whereas working people
8  were increased to five.
9  Q. Okay.
10  A. However, whenever a benefit was better for
11  an improvement in the plan, that improvement was
12  always given to the retirees.
13  So, they got the benefit of a good
14  change, and they did not have the non-benefit of a
15  change that was more expensive to them.
16  Q. Okay.
17  A. So, that's the philosophy that we were
18  working with.
19  Q. All right. And so, your conclusions about
20  or your assumptions about what the rules were were
21  drawn from observing that practice over time?
22  A. Yes, yes.
23  Q. And did you ever hear anyone in Management
24  go beyond a description of what the practice had

8 (Pages 26 to 29)

Page 30

1  been, such as you just described, and say that that
2  was Company policy or a rule that retirees could
3  only be affected by changes that were beneficial to
4  them in their benefits, not by any change that would
5  make their benefits less?
6      A. Are you asking if anybody actually said that
7  to me that that was a practice or Company policy?
8      Q. More than a practice, but it was actually a
9  Company policy or rule?
10     A. No. Nobody ever told me that.
11     Q. Did you ever overhear anybody saying that to
12 others, anybody in Management making that point to
13 someone else?
14     A. No.
15     Q. Now, at any point in the 11 years that you
16 were the supervisor, did your understanding of
17 whether retirees' benefits could be changed change
18 from what it had been at the beginning of that
19 11-year period?
20     A. Toward the end of that 11-year period.
21     Q. Okay. And what caused it to change?
22         What changed your understanding of how
23 this worked?
24     A. Bernard Peloquin.

Page 31

1      Q. Okay. At some point, did you begin working
2  with Mr. Peloquin?
3      A. I did, but he would attend Ready Or Not
4  sessions.
5      Q. All right.
6      A. And at that time, we started to hear the
7  flavor that these benefits were not guaranteed, and
8  they could change.
9      Q. And did you hear Mr. Peloquin make that
10 point at Ready Or Not sessions yourself?
11     A. Yes.
12     Q. And did you hear him do that even before you
13 directly worked with him?
14     A. Yes.
15     Q. All right. Were you aware -- did it come to
16 your attention at all when Mr. Peloquin joined the
17 Company?
18     A. When he joined the Company?
19     Q. When he first started working for the
20 Company.
21     A. No, I did not know.
22     Q. If you can recall, when do you think you
23 first met him?
24     A. When he joined the benefits department,

Page 32

1  which I think was around 1994.
2      Q. Okay. And did he first begin attending
3  these Ready Or Not sessions when he joined the
4  benefits department?
5      A. I would think so, but I couldn't say for
6  sure.
7      Q. Okay.
8      A. I'm not exactly sure when he joined the
9  benefits department.
10     Q. Are you pretty certain he didn't attend
11 Ready Or Not sessions before he joined the benefits
12 department?
13     A. I did not see him at any of those.
14     Q. All right. And you're clear that he did
15 attend Ready Or Not sessions after he joined the
16 benefits department?
17     A. Yes, yes.
18     Q. And would it comport with your recollection
19 that he began attending them roughly around the time
20 he joined benefits in 1994?
21     A. I would think so.
22     Q. All right. Now, did he have a particular
23 piece that he was responsible for presenting to the
24 folks attending these sessions?

Page 33

1      A. He did a presentation on selecting a
2  financial advisor.
3      Q. Okay. Was he, was he someone to whom
4  questions could be directed by those attending
5  sessions?
6      A. Yes.
7      Q. Were they free to ask him questions on
8  subjects other than the particular presentation that
9  he had made?
10         If he had spoken, for example, on
11 selecting a financial advisor, were employees and
12 their spouses limited to asking him questions about
13 just that subject?
14     A. No.
15     Q. Now, did you observe, hear yourself, in
16 person, anyone besides Mr. Peloquin make the point
17 to folks attending the Ready Or Nots that retiree
18 health benefits could be subject to change in the
19 future?
20     A. Yes; especially in the later sessions, the
21 later years.
22     Q. Okay. Who else besides Mr. Peloquin did you
23 hear make that point?
24     A. Well, I think Doug Miller would have made

9 (Pages 30 to 33)

Page 34

1    that point.
2        Q.  When you say he would have, are you assuming
3    that that's likely, or do you recall actually
4    hearing him do so?
5        A.  I believe I've heard him do so.
6        Q.  Okay.  I'm sorry for interrupting.
7            Anyone else?
8        A.  And the person making the presentation, you
9    know, Kate Casale or any of the benefit reps that
10   were attending the session; Don Tucker -- maybe not
11   Don Tucker -- Don Graham.
12           I don't think Don Tucker would have said
13   that.  That was before.
14       Q.  Had he -- are you saying that Mr. Tucker
15   stopped being in that role by the time Mr. Peloquin
16   was on board and making the point that these things
17   could change?
18       A.  I believe so.
19       Q.  All right.  What about Betty Hayes?
20           And what I mean by that is, do you
21   recall whether Ms. Hayes ever shifted from saying
22   nothing about benefits being subject to change in
23   retirement to pointing out that they could possibly
24   change in retirement?

Page 36

1    to Doug Miller at corporate?
2        A.  No.
3        Q.  Okay.  Did Mr. Miller ever give you
4    instruction about the content of your presentation
5    to the folks at the Ready Or Not sessions?
6        A.  No.
7        Q.  Did you ever observe him give such
8    instruction -- excuse me -- to any of the other
9    benefits people who made presentations at Ready Or
10   Not sessions?
11       A.  No.
12       Q.  Did you ever -- does that include Betty
13   Hayes?
14       A.  I didn't see him give her any instructions.
15       Q.  Did you ever learn secondhand that he had
16   given instructions to any of the other benefit
17   people who made presentations at the Ready Or Nots?
18       A.  No.
19       Q.  Okay.  Speaking just for yourself -- now,
20   I'm just really asking about your own thought
21   process in, say, 1986, when you became the
22   supervisor -- would it be fair to say that it was
23   your assumption that whatever benefits an employee
24   retired with, health benefits I'm referring to,

Page 35

1        A.  I don't recall specifically.  She might
2    have.
3        Q.  Okay.
4        A.  I'm not sure when she left.
5        Q.  All right.
6            (Pause.)
7        Q.  In the 11 years that you were the supervisor
8    of payroll and employee benefits at Comm. Gas, who
9    did Mr. DiNardo report to?
10       A.  Well, he reported to Ken Margossian, the
11   president of Commonwealth Gas Company.
12       Q.  All right.
13       A.  No.  Wait a minute.  I'm sorry.
14           He reported to the vice-president of
15   human resources.
16           Ken Margossian had that position at some
17   point, but that was before I was the supervisor of
18   payroll and benefits.
19           So, it was Jack Connors was the
20   vice-president.
21       Q.  Was that who Mr. DiNardo reported to?
22       A.  Yes.
23       Q.  All right.  And did Mr. DiNardo or you have
24   any sort of dotted-line reporting relationship over

Page 37

1    would remain unchanged throughout that person's
2    retirement?
3        A.  Yes, it was.
4        Q.  Okay.  And is it also fair to say that that
5    remained your assumption up until the time that you
6    began to hear Mr. Peloquin say something different
7    than that at Ready Or Not sessions?
8        A.  Yes.
9        Q.  Okay.  Can you recall over what portion of
10   the 11 years that you were the supervisor of payroll
11   and benefits Betty Hayes was with the Company and
12   making regular presentations at the Ready Or Nots?
13       A.  Just about that whole time.
14       Q.  Oh, okay.  All right.
15           And at some point during that span of
16   years, did you hear Ms. Hayes at Ready Or Not, at a
17   Ready Or Not session indicate to the participants
18   that retiree health benefits could be changed in
19   retirement?
20       A.  I don't recall her saying that.
21       Q.  Okay.  And do you recall whether she said
22   the opposite; that they could not be; that whatever
23   the benefit was at the time of retirement would
24   remain the exact same throughout the individual's

10 (Pages 34 to 37)

Page 38

1  life?

2      A.  No.  Could you just repeat that, please?

3      Q.  Right.  You had said you don't recall her

4  specifically saying that there would be a change in

5  a retiree's health benefits.  And I was wondering

6  about the reverse.

7          Did she ever say to people, there can

8  never be a change in your health benefits once you

9  retire?

10     A.  I must be -- didn't you just say the same

11  thing?

12         Could you --

13     Q.  Sure.  That's all right.

14         I guess the first thing I was asking

15  about was, did she warn them it could change.

16         And you said you don't recall her saying

17  that ever.

18     A.  Right.

19     Q.  And the second question was, well, did she

20  promise them it never would change?

21     A.  No.  I don't think it ever came up.  I never

22  heard her say that.

23     Q.  Did you ever have a conversation with Betty

24  Hayes yourself -- and I'm not talking to a

Page 39

1  presentation about one of the groups at the Ready Or

2  Not; just a conversation between the two of you --

3  where the subject came up of whether retiree

4  benefits were guaranteed for life once the person

5  retired?

6      A.  No, it didn't.

7      Q.  Okay.  While you were with Comm. Gas, did

8  you attend any kinds of seminars or training

9  sessions of any kind with respect to benefits before

10  you became the supervisor of payroll and benefits or

11  while you were supervisor?

12     A.  No.

13     Q.  Was your training for the position, do you

14  think, would it be fair to characterize it as

15  on-the-job training?

16     A.  Yes.

17     Q.  All right.  And when you met with folks at

18  Ready Or Not sessions, did you hand anything out in

19  writing to them describing what their situation

20  would be once they retired?

21         Before I ask you that question, you

22  already said earlier that later on in the process,

23  they'd get a sheet that had numbers showing what

24  their pension would be.

Page 40

1          And if I understood you, in the earlier

2  years, you folks gave them the information

3  sufficient to permit them to do a calculation of

4  their pension benefit.

5      A.  The whole time.  There were overheads and

6  handouts during all of the Ready Or Not sessions,

7  but just in later years, they were given additional

8  information which was their own pension calculation

9  at Ready Or Not.

10     Q.  All right.  Now, was Don Graham your

11  counterpart at Comm. Electric while you were at

12  Comm. Gas?

13     A.  Yes; for part of the time.

14         When I first became supervisor of

15  payroll, he was the payroll supervisor at Comm.

16  Energy.

17         And Don, Donald Tucker was my

18  counterpart at Commonwealth Electric.

19     Q.  All right.

20     A.  And when Donald Tucker retired, then Donald

21  Graham became my counterpart with the payroll and

22  benefits.

23     Q.  Do you have an approximate recollection when

24  that was that Mr. Tucker retired and Mr. Graham

Page 41

1  moved into the job?

2      A.  Probably around 1990.

3      Q.  Okay.  In addition to having the opportunity

4  to attend Ready Or Not sessions, did Comm. employees

5  have an opportunity to sit down individually with

6  any representatives from benefits to get more

7  one-on-one attention on these same kinds of issues?

8      A.  Oh, yes; definitely.

9      Q.  And if an employee of Comm. Gas, for

10  example, between '86 and '97 wanted to sit with

11  someone and ask some questions, who could they have

12  met with for that purpose?

13     A.  That was me.

14     Q.  Okay.  And did you make it a practice to

15  hold such meetings?

16     A.  Yes.  That was part of my job.

17     Q.  Would it be fair to say that most Comm. Gas

18  folks, before retiring, did ask to sit down and go

19  over it with you?

20     A.  All -- I would have met with all of them.

21     Q.  All right.  And in preparation for those

22  sessions, the individual sessions, were you given

23  instruction by anyone on what to say to the

24  employees?

11 (Pages 38 to 41)

Page 50

1  it's Exhibit 15 to Mr. Miller's deposition, but
2  we'll mark it in your deposition as well.
3         This is a document titled, Information
4  Relative To Employee Benefits Upon Your Retirement
5  Date. It shows that it was prepared for Suzanne
6  Dupont at Comm. Electric Company.
7         And the Bates stamp on the first page is
8  No. 3758.
9         Would you take a look at this and see if
10  this type of document is one that you were familiar
11  with?
12         I'm not really asking about the
13  particular detail of this individual employee and
14  the amounts or benefit levels, but rather whether
15  the type of document was familiar?
16      A. Yes. This is the document that we used to
17  fill in when they were actually going to retire, to
18  fill in their information. I have the same one.
19      Q. So, it was the second step of that two-step
20  process that you referred to earlier?
21      A. Yes.
22      Q. And that particular format was used
23  throughout the Comm. Energy system?
24      A. Yes. This was provided to us by Comm.

Page 51

1  Energy Corp.
2      Q. All right. Would you take a look at about,
3  I think it's going to be about the fifth page in of
4  that document, maybe the fourth.
5      A. Health insurance?
6      Q. Yes. There's a paragraph on medical
7  insurance.
8         And do you see a reference there to
9  something like, this coverage will be for your life?
10         (Pause.)
11      A. No.
12      Q. All right. May I take a look at that
13  document for just a second.
14         (Pause.)
15      Q. In Paragraph 3A, that talks about Medicare
16  Part B. The document given to this employee, the
17  one you're looking at, states that the Company will
18  pay for reimbursement for Medicare Part B, right?
19      A. Yes.
20      Q. Do you recall whether you were ever asked by
21  employees whether that particular provision was
22  guaranteed for life?
23      A. I don't believe anybody asked me if it was
24  guaranteed for life.

Page 52

1         MR. MUNTYAN: All right. Would you mark
2  this as Exhibit 1 to Ms. Cormier's deposition,
3  please.
4         (Marked, Exhibit 1, Information Relative
5  To Employee Benefits Upon Your Retirement Date,
6  regarding Suzanne Dupont.)
7         MR. MUNTYAN: And you can mark that 2.
8         (Marked, Exhibit 2, Information Relative
9  to Employee Benefits Upon Your Retirement Date,
10  regarding Vincent A. Crowley.)
11      Q. Now, Ms. Cormier, I'm going to leave Exhibit
12  1 where you can see it.
13         Exhibit 2 appears to be a similar
14  document headed, Information Relative To Employee
15  Benefits Upon Your Retirement Date. This one is for
16  Vincent A. Crowley.
17         MR. MUNTYAN: And for the record, I'll
18  note, I believe this was used as Exhibit 16 in the
19  Miller deposition.
20      Q. As we did with Exhibit 1, first, I want to
21  ask you, please, to look at that Exhibit 2, and let
22  me know if you recognize that?
23      A. Yes, I do.
24      Q. On the first page of Exhibit 1, Suzanne

Page 53

1  Dupont's document, it shows that the actual
2  retirement date will be June 1 of 1995?
3      A. Yes.
4      Q. Can you tell me what the actual retirement
5  date is for Mr. Crowley?
6      A. August the 1st, 1998.
7      Q. All right. And would you look at the
8  corresponding health insurance section in Exhibit 2,
9  the one most like what you looked at before in
10  Exhibit 1 on health?
11         Could you just read that through to
12  yourself for a moment, so you're familiar with it.
13         (Pause.)
14      A. Okay.
15      Q. When I compare those two documents, I see
16  that there are some differences applicable to health
17  insurance in retirement in the first and the second.
18         And I wanted to ask you whether or not,
19  while you worked for Comm. Gas, the differences in
20  these two documents were ever brought to your
21  attention?
22      A. No. I don't believe they were.
23      Q. All right. Is it fair to say that Exhibit
24  2, like Exhibit 1, was something that was generated

14 (Pages 50 to 53)

Page 102

1 prospective retirees that their benefits could
2 change during retirement.
3       And I thought what you said was that you
4 didn't get that flavor until Mr. Peloquin attended
5 the Ready Or Not sessions.
6       Is that accurate?
7    A. Yes.
8    Q. Now, can I ask you to distinguish for a
9 moment between what your understanding was from
10 Mr. Peloquin or from anyone else and what was said
11 at the Ready Or Not sessions?
12       And I guess this is my question.
13       Did you first realize that the Company
14 policy was different from what had been the practice
15 from what you heard at a Ready Or Not session?
16    A. I can't -- it wasn't the policy. I can't
17 say it was a policy, but it was just the sharing of
18 the information that that right to change the
19 benefits, your medical benefits, has always been
20 there. And the Company has the right to change
21 them, but not that the Company policy had changed.
22       In fact, I believe they said at this
23 point, there wasn't any intention of changing the
24 benefits at this point in time.

Page 103

1       So, the policy, there wasn't really a
2 policy that these benefits would or would not
3 change.
4    Q. Okay. So, the Company, as you understood
5 it, at least in 1994, the Company reserved the
6 right, under some set of circumstances, to change
7 the health benefits?
8    A. Right. As it says in the summary plan
9 descriptions, they reserve the right to change
10 those.
11    Q. Okay. All right.
12       And you at least heard that in the Ready
13 Or Not sessions in '94 or '95?
14    A. Whenever Bernie started adding them,
15 somewhere in that time period, yes.
16    Q. Now, before that, did you understand that
17 the Company, under some set of circumstances,
18 retained the right to alter retiree health benefits?
19    A. Well, they retained the right to do it, but
20 they really didn't want to, they didn't want to
21 change any of the benefits negatively.
22       That's why, for example, they didn't go
23 from the $3 to the $5 co-pay. They didn't want to
24 challenge changing. They wanted to keep it the way

Page 104

1 it was.
2    Q. And did you know that before 1994?
3    A. Yes; whenever that three -- yes; right.
4    Q. Whenever the $3/$5 co-pay went in?
5    A. Yes. I knew they didn't want to get into
6 that whole issue of changing retire health benefits
7 negatively; just positively.
8    Q. Were you involved in discussions around that
9 issue?
10    A. Not really. All those discussions would
11 have happened at Comm. Energy.
12       So, we'd just sort of hear it.
13    Q. Do you recall when it was that the -- the
14 $3/$5 issue we're talking about is the prescription
15 drug co-pay, isn't that right?
16    A. Yes.
17    Q. Do you recall when the prescription drug
18 co-pay increased from $3 to $5?
19    A. It was quite a long time ago. I think it
20 was in the late '80s. I don't recall the exact
21 date.
22    Q. But you do understand that retirees who had
23 retired with the $3 prescription co-pay did not have
24 that increased?

Page 105

1    A. Oh, yes; right.
2    Q. Now, in 1997, the Company was essentially
3 proposing a retirement incentive with this personnel
4 reduction program?
5    A. Yes.
6    Q. Is that right?
7    A. Yes.
8    Q. Do you recall that the goal of the Company
9 was to encourage a large number of people to retire?
10    A. To terminate employment, yes.
11    Q. To terminate employment?
12    A. Yes.
13    Q. Do you recall what the target was for the
14 personnel reduction program in terms of reduced head
15 count?
16    A. I think it was 500 system-wide.
17    Q. And was that, was that goal achieved?
18    A. Yes.
19    Q. Would it be fair to say that the purpose of
20 the personnel reduction program was to reduce head
21 count?
22    A. Yes.
23    Q. And incent people, to encourage people to
24 retire by giving them benefits that they wouldn't

27 (Pages 102 to 105)